**Juan C. MACIAS et al., Plaintiffs,**

**v.**

**Robert H. FINCH et al., Defendants.**

**No. 50956.**

United States District Court,
N. D. California.

Jan. 5, 1970.

Don B. Kates, Jr., Peter D. Coppelman, Gilroy, Cal., Robert L. Gnaizda, Martin R. Glick, Daniel Hays Lowenstein, Lucy McCabe, Steven J. Antler, Peter E. Sitkin, San Francisco, Cal., for plaintiffs.

Thomas C. Lynch, Atty. Gen., Elizabeth Palmer, Gerald F. Canveras, Deputy Attys. Gen., San Francisco, Cal., for defendant John C. Montgomery.

Cecil F. Poole, U. S. Atty., William B. Spohn, Asst. U. S. Atty., San Francisco, Cal., for defendant Robert H. Finch, Secretary, Dept. of Health, Education & Welfare.

John R. Kennedy, County Counsel, Nordin F. Blocker, Deputy County Counsel, San Jose, Cal., for defendant Frederick B. Gillette.

Before DUNIWAY, Circuit Judge, and SWEIGERT and PECKHAM, District Judges.

DUNIWAY, Circuit Judge:

The defendants in this action have filed a motion to dismiss it. The federal defendant, Robert H. Finch, Secretary of the United States Department of Health, Education, and Welfare, raises both jurisdictional and substantive contentions. The other defendants—John C. Montgomery, Director of the California Department of Social Welfare, and Frederick B. Gillette, Director of the Santa Clara County Public Welfare Department—contend that the complaint fails to state a claim upon which relief can be granted. (Rule 12, F.R.Civ.P.) We discuss the various procedural and substantive contentions separately.

1. *Need for a Three-Judge Court.*

We first consider whether a three-judge court is necessary in this case. The plaintiffs[1] attack the constitutionality of two congressional statutes (42 U.S.C. §§ 606(a) and 607) and of a state statute, § 11250(b) of the California Welfare & Institutions Code. They now contend, however, that no statute—either federal or state—need be declared unconstitutional.

Instead, the plaintiffs assert that the action can be read as challenging federal regulations defining the requirements for state plans authorizing aid to dependent children of unemployed fathers. 45 C.F.R. § 233.100, 34 Fed.Reg. 1146 (1969). The regulation, promulgated on January 23, 1969, states that the state plan must include a definition of an unemployed father

(i) which shall include any father who is employed less than 30 hours a week, or less than three fourths of the number of hours considered by the industry to be full time for the job, whichever is less, and

(ii) which may include any father who is employed less than 35 hours a week, or less than the number of hours considered by the industry to be full time for the job * * * 45 C.F.R. § 233.100(a) (1) (i) and (ii).

The plaintiffs claim that this is the only instance in the welfare system where a needy family is denied assistance solely because of an arbitrary number of hours worked, rather than because of need or income. Assuming their challenge to the regulation is upheld, and further assuming that validity of the federal and state statutes need not be considered, then a three-judge court would not be required. (28 U.S.C. § 2282; C. Wright, Federal Courts 163 (1963 ed.).)

1. The plaintiffs are Juan Macias, his wife Guadalupe, and their nine children, and Francisco Tarin, his wife Conception, and their twelve children. The complaint contains the following allegations: Juan Macias is fully employed as a security official, and he earns almost forty per cent less than the State Welfare Department has determined as the minimum necessary to maintain his children at a minimum subsistence level. Francisco Tarin began a full-time job picking mushrooms on February 1, 1969. Before that, he was unemployed and received AFDC payments from defendants of $424 per month. During his first month on his new job he earned a total of $308.61, an amount more than 25 per cent below what he was receiving when he was out of work.

California's Santa Clara County, in which both families reside, has been providing money through a program of general assistance to both families. The addition of these funds, however, still is not sufficient to bring the families' income up to the level which would be attained if they were eligible for the California AFDC program, especially when the program of medical assistance for those who qualify for AFDC payments is considered.

However, because this court finds that the regulation is properly within the scope of the Social Security Act (see *infra*), it must reach the constitutional attacks on the statute, which do require a three-judge court. Furthermore, even if this court were to strike down the federal regulation, it has serious doubts whether the attack on the California statute could be dismissed from this litigation. While Cal.Welf. & Inst.Code, § 11201(b) provides that California law shall remain consistent with federal regulations, it nevertheless defines an unemployed parent as one who "is employed only *part time* as determined in accordance with such standards as may be developed \* \* \*." (Emphasis added.) Thus, the section specifically defines an unemployed parent in terms of time worked, a criterion which the plaintiffs claim is unconstitutional. Arguably, it can be said that if the federal regulation is struck down for defining unemployment solely in terms of hours worked, then the words "part time" in the California statute could no longer be defined solely in terms of time worked. This appears strained, however, since the very words "part time" demonstrate a concern with time, not other factors like need and income. Hence, if the court were to strike down the federal regulation because of an improper and arbitrary standard of hours worked, it appears that the California statute would likewise fall, necessitating a three-judge court.

Accordingly, we find that a three-judge court is required, and we proceed with a discussion of the defendants' procedural and substantive contentions.

### 2. *Jurisdiction and Venue.*

■ In his motion to dismiss, the federal defendant asserts that the court lacks personal jurisdiction over him and that venue with respect to him in the Northern District of California is improper. As to the first contention, the Secretary claims he was not served personally within the territorial limits of California, and that neither Fed.R.Civ. P. 4(d) (5) or 28 U.S.C. § 1391(e) provide for extraterritorial service of process by mail. Because this contention is so intertwined with the venue argument, the two contentions will be discussed together.

The venue argument is predicated solely on the literal language of the federal statute. The pertinent statutory parts are 28 U.S.C. § 1391(b) (which says venue is proper in a non-diversity suit only in the judicial district where all defendants reside or in which the claim arose) and 28 U.S.C. § 1391(e) (which provides that a suit can be brought where the cause of action arose if it is a civil action "in which *each* defendant is an officer or employee of the United States." (Emphasis added).)

The federal defendant asserts that this language, plus the legislative history show a congressional intent to extend the venue provisions only in actions exclusively against federal officials. The decisions are split on the interpretation to be given these federal venue provisions. *Accord* with the government position: Town of East Haven v. Eastern Airlines, 282 F.Supp. 507 (D.Conn.1968); Chase Savings & Loan Ass'n v. Federal Home Loan Bank Board, 269 F.Supp. 965 (E.D. Penn.1967); United Publishing and Printing Corp. v. Horan, et al., 268 F. Supp. 948 (D.Conn.1967); *contra:* Brotherhood, etc. Engineers v. Denver etc. R.R. Co., 290 F.Supp. 612 (D.Colo. 1968); Powelton Civic Home Owner's Association v. Department of Housing and Urban Development, 284 F.Supp. 809 (E.D.Penn.1968).

■ This court accepts the government's basic contention that 28 U.S.C. § 1391(e) does not contemplate that a federal official in Washington should be dragged into every local controversy involving both private and governmental parties. Nonetheless, when Congress added subsection (e) to section 1391 in 1962, it did express an intent to broaden the allowable venue to an extent somewhat beyond the literal terms of the language which it used in its enactment.

The House Judiciary Committee Report accompanying H.R.1960, the bill which ultimately was enacted as Pub.L. 87–748, 76 Stat. 744, amending section 1391, states:

> "Section 2 [now subsection (e)] * * * is designed to permit an action which is *essentially against the United States* to be brought locally rather than requiring that it be brought in the District of Columbia simply because Washington is the official residence of the officer sued. * * *
>
> Frequently the administrative determinations involved are made not in Washington but in the field. *In either event these actions are in essence against the United States.* * * *"

(H.R.Rep.No.536, 87th Cong., 1st Sess. 2, 3 (1961).) (Emphasis added.)

Very similar statements are found in S.Rep.No.1992, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, p. 2784, regarding the same bill. Thus, when read in conjunction with the congressional commentary surrounding its enactment, section 1391(e) appears to envision that a federal defendant residing in Washington could be brought into an action outside Washington although non-federal parties were also joined as co-defendants where the action was "essentially against the United States."

This particular action is one which is "essentially against the United States" despite the presence of local, non-federal defendants. The funding of state AFDC programs comes in large part from the federal government, and further, the thrust of plaintiffs' complaint is against a federal regulation which the states must follow to obtain the federal assistance. Accordingly, this court finds against the federal defendant's contentions concerning lack of personal jurisdiction and improper venue.

### 3. *Validity of the Federal and State Statutes and Regulations.*

■ 42 U.S.C. § 607 provides that a child who is needy can qualify as a "dependent child" if he is "deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the Secretary) of his father * * *." In 45 C.F.R. § 233.100, 34 Fed.Reg. 1146 (1969), the Secretary has defined an unemployed father as one who is employed "less than 30 hours a week, or less than three fourths the number of hours considered by the industry to be full time for the job, whichever is less." 45 C.F.R. § 233.100(a) (1) (i). Subsection (ii) states that the definition may include any father who is employed less than 35 hours a week.

Cal.Welf. & Inst.Code, § 11201 provides:

> "For purposes of this chapter, 'unemployed parent' means a natural parent, adoptive parent, or step-parent with whom the child is living, and who: (a) Is not working but is available for and seeking employment * * * or
>
> (b) Is employed only part time as determined in accordance with such standards as may be developed by the department in its rules and regulations, which standards shall be consistent with federal law and regulations governing the payment of federal funds to this state under the Social Security Act and consistent with other provisions of this chapter."

In the California State Department of Social Welfare Manual, 42–340.1 the following definition of unemployment is used:

> "Deprivation due to unemployment of a parent exists when either parent is:
>
> 11. Not working at all and is available for and seeking employment, or is receiving training essential to his further self-support *or*
>
> 12. Employed only part time.
>
> .121 Part-time employment is that which
>
> a. Affords less than 152 hours of regular work per month: or

b. Affords less than the number of hours considered by the industry to be full time for the job, as established by the California State Employment Service if under 152 hours."

This California regulation reflects the full scope of federal matching which is available in assistance payments because of the unemployment of a father.

The plaintiffs argue that the federal regulation is unauthorized by the federal statute, and, in the alternative, that if it is authorized both the state and federal statutes and regulations are unconstitutional.

a. *Statutory authorization of the federal regulation.*

Section 401 of the Social Security Act as amended 42 U.S.C. § 601, provides authority for the appropriation of federal monies to states for "the care of dependent children in their own homes or in the homes of relatives * * *." Until 1961 the category of "dependent child" was limited to those needy children defined as a child who had "been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who [is] living with [his] father, mother, [or other named relative] * * *." 42 U.S.C. § 606(a). See King v. Smith, 1968, 392 U.S. 309, 318 n. 13, 88 S.Ct. 2128, 20 L.Ed.2d 1118. In 1961 Congress enacted Pub.L. 87–31, 75 Stat. 75, which added 42 U.S.C. § 607 to the Social Security Act, permitting states to broaden their definitions of "dependent child" to include children deprived of parental support or care by reason of the unemploy-

ment of a parent. "Unemployment" was to be defined by each state. By 1967, twenty-two states had amended their AFDC plans to include dependent children of unemployed parents. All of these plans defined unemployment in terms of hours worked rather than in terms of the amount of wages received, although considerable variation existed in the hourly limits.[2]

Section 607 was amended in 1968 to remove from the states the authority to define unemployment and to authorize the Secretary of Health, Education, and Welfare to prescribe standards for determining unemployment. Act of January 2, 1968, Pub.L. 90–248, Title II, § 203(a), 81 Stat. 882. The legislative history of the 1968 amendments indicates that Congress was displeased with the existing widely varying state definitions, although not necessarily with the terms in which the state regulations were drawn. With respect to the authority given the Secretary, the House Report stated:

"The program of benefits for the dependent children of unemployed parents was established on a 1-year basis in 1961 and subsequently extended for 5 years by the 1962 amendments to the Social Security Act. The program is optional with the States and currently 22 States have programs under the Federal legislation.

"A major characteristic of the law is the authority left to the States to define 'unemployment.' Your committee believes that this has worked to the detriment of the program because of the wide variation in the definitions used by the States. In some instances, the definitions have

**2.** The Secretary's memorandum in support of his motion to dismiss represents that definitions of unemployment varied from employment under 40 hours per week in such states as Illinois, Delaware, and Rhode Island to employment under 30 hours per week in Arizona. His memorandum also informs us that some states such as Ohio, New York, and Oregon permitted either or both parents to qualify as unemployed within the meaning of section 607 while Maryland permitted only the father to qualify, and such states as Arizona, Delaware and Illinois permitted either parent, but not both parents, to be eligible. Evidently further variation among the states existed regarding factors such as prior attachment to the work force and receipt of unemployment compensation benefits.

been very narrow so that only a few people have been helped. In other States, the definitions have gone beyond anything that the Congress originally envisioned. Your committee's bill is designed to correct this situation and to make other improvements in the program.

"The overall objective of the amendments proposed by the committee is to authorize a Federal definition of unemployment by the Secretary (but within certain limits set forth in the legislation), to tie the program more closely to the work and training program authorized by the bill, and to protect only the children of unemployed fathers who have had a recent attachment to the work force. * * * " H.R.Rep.No.544, 90th Cong., 1st Sess. 107–108 (1967).

Congress spelled out in the amended statute the reach of some of the factors other than hours worked by which the states had defined "unemployment." For example, section 607 now provides for application of its provisions to unemployed fathers rather than unemployed parents, requires that a father have a recent attachment to the labor force, and prohibits concurrent receipt of unemployment compensation and assistance payments. It apparently was the standard for the remaining major factor, hours worked, which was to be prescribed by the Secretary.

Thus, the adoption of a standard prescribed in terms of hours worked not only is consistent with prior state treatment and common parlance, but was within the contemplation of the Con-

gress when it was considering its delegation of authority to the Secretary. More specifically, the Secretary's action in requiring inclusion of any otherwise eligible father who is employed less than 30 hours a week, and allowing inclusion of a father who is employed less than 35 hours a week comports with Congress' expressed intent that he steer his way between "definitions [which] have gone beyond anything that Congress originally envisioned," and "definitions [which] have been very narrow so that only a few people have been helped." H.R. Rep.No. 544, *supra*. Earlier state definitions had varied between 30 and 40 hours worked per week. See note 2, *supra*.

Plaintiffs' contention that "unemployment" must take into account the amount earned by the father and the need of the family as well as hours worked conflicts with the 1968 amendments and their legislative history as well as with common parlance and prior state practice.[3] Congress intended to authorize prescription of a uniform standard which found the middle ground between the outer limits of the then-existing state programs. No state program went as far as that advocated by plaintiffs. The Secretary's regulation complies with this congressional intent and accordingly is within the scope of Section 607.[4]

b. *Constitutionality of the federal and state statutes and regulations.*

Plaintiffs argue that when aid to other families with dependent children is based on the need of the family, it is so arbitrary and capricious as to violate

---

3. Such a contention also conflicts with the congressional policy to deal with income problems of employed people through labor laws. See part 3. b. *infra.*

4. We reach this conclusion despite our recognition that the obvious consequences flowing from the Secretary's definition of employment respecting fathers with large families and low hourly rates of payment are either to discourage them from seeking employment or to encourage them to desert their families. Either consequence

is inconsistent with the underlying purposes of the Social Security Act. See 42 U.S.C. § 601.
Congress apparently is aware of this inconsistency because bills containing ameliorative amendments have been introduced in the current and the most recently concluded sessions of Congress. See S. 1960, 91st Cong., 1st Sess. (1969) ; S. 2893, 90th Cong., 2d Sess. (1968). See also 115 Cong.Rec.S. 4131 (daily ed. April 25, 1969).

both Equal Protection and Due Process to deny aid to otherwise eligible needy children solely because the father works more than a given number of hours.

■ While it is true that the Fifth Amendment contains no Equal Protection Clause, nevertheless if federal statutes and regulations authorize or restrict expenditure of federal money by states in such a manner that the states would violate the Equal Protection Clause, the federal statutes and regulations are unconstitutional. The opposite, of course, holds true. As the Court said in Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600:

> "Congress may not authorize the States to violate the Equal Protection Clause. Perhaps Congress could induce wider state participation in school construction if it authorized the use of joint funds for the building of segregated schools. But could it seriously be contended that Congress would be constitutionally justified in such authorization by the need to secure state cooperation? Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate the Equal Protection Clause." (Id. at 641, 89 S.Ct. at 1335.)

See also Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

Plaintiffs assert two alternative legal theories, either of which they contend would require that we declare section 607 and its attendant regulation unconstitutional. First, they assert that they have a constitutional right to seek and hold employment, relying on Truax v. Raich, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; Schware v. Board of Bar Examiners of New Mexico, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796; and Greene v. McElroy, 1959, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377. The federal statute and regulation is said to penalize the exercise of this right. Then they draw from Shapiro v. Thompson, *supra,* the proposition "that a mere showing of a rational relationship" is not enough, but rather "any classification which serves to penalize the exercise of [a constitutional] right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." (394 U.S. at 634, 89 S.Ct. at 1331.)

As a separate second ground, but one relevant to the "compelling" showing required under the first, plaintiffs assert that defendants do not even have a rational basis for the regulation. They say that "the *number* of hours worked, as opposed to the *income* from employment, is totally unrelated to the purposes of the Social Security Act."

Truax v. Raich, *supra,* and the other two cases cited do not support the existence of a right to seek and hold employment such that it could be infringed by the factual showing here presented. *Truax* dealt with an Arizona law which proscribed employment of aliens numbering in excess of 20 per cent of the work force of employers of five or more people. Much of the case rests on discrimination against aliens, and indeed, that part of the opinion on which plaintiffs seek to rely incorporates reliance on a "suspect" basis for classification:

> "[The State's police power] does not go so far as to make it possible for the State to deny to lawful inhabitants, *because of their race or nationality,* the ordinary means of earning a livelihood. It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure. [Citations.] *If this could be refused solely upon the ground of race or nationality,* the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words." (239 U.S. at 41, 36 S.Ct. at 10.) (emphasis added)

Schware and Greene v. McElroy, *supra*, dealt with cases where licensing or employment restrictions bore too heavily upon First Amendment and Procedural Due Process rights to be sustained. Thus, the upshot of *Truax, Schware*, and Greene v. McElroy, *supra*, seems to be that the "liberty" and "property" concepts of the Fifth Amendment do encompass the right "to follow a chosen profession free from unreasonable governmental interference." Greene v. McElroy, *supra*, 360 U.S. at 492, 79 S.Ct. at 1411. But, by "unreasonable," what is meant is a wholly arbitrary and irrelevant means of classification [5] or a classification which offends enumerated constitutional rights.[6]

The present situation, however, is one in which the impact on employment is not derived from a classification based on a suspect status, like race or alienage, or on the exercise of a specifically protected right, like freedom of speech, assembly, or religion. Thus, unlike *Shapiro*, although "rights" to employment/welfare payments are here involved, since the restrictions on the "rights" are not drawn in terms of suspect classes or to impinge on specifically enumerated rights, a "compelling" governmental interest need not be shown to sustain the regulation. McDonald v. Board of Election Commissioners of Chicago, 1969, 394 U.S. 802, 806–808, 89 S.Ct. 1404, 22 L.Ed.2d 739.[7]

As to the usual rules for testing a discrimination, Morey v. Doud, 1957, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485, states:

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if

---

5. Dent v. West Virginia, 1889, 129 U.S. 114, 122, 9 S.Ct. 231, 32 L.Ed. 623.

6. Schware v. Board of Bar Examiners of New Mexico, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796; Truax v. Raich, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131.

7. See also *Developments in the Law— Equal Protection*, 82 Harv.L.Rev. 1065, 1192 (1969):

"But the suggestion that government has an affirmative duty to raise everyone to a minimum acceptable standard of living has not yet assumed the dignity of a constitutional proposition. Three major reasons for this lack of development may be suggested. The first is the conceptual difficulty of finding support for the proposition in the Constitution. This section has emphasized the flexibility of the equal protection clause and the room which it allows for judges to give it content. But the guarantee of a minimum standard of living appears to be on a completely different level from the guarantee of effectively equal access to the criminal process, to the political process, to education, or even to other state activities. The latter find their sources primarily, if not exclusively, in the state. One seeking income, housing, or a job, on the other hand, is remitted primarily to the private sector for satisfaction of his needs. Extending the equal protection clause from a guarantee of similar equality in these areas seems improper precisely because the latter are not benefits we customarily think the state is in the habit of distributing at all. Second, the practical problems in reallocating resources according to an infinite variety of needs, and in establishing acceptable minimum norms would be far greater than those which have already attended judicial efforts to impose precise standards of equality on the states. Finally, state and federal legislatures themselves have taken significant, if as yet small, strides through social security and other welfare measures to provide minimum standards for selected groups of people. The programs are not comprehensive, but they suggest a possibly more acceptable means of reflecting society's broadening concepts of equality."

any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." (*Id.* at 463–464, 77 S.Ct. at 1349.)

See also Flemming v. Nestor, 1960, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435.

How the discrimination question is framed in large measure suggests the proper result in this case. Plaintiffs would ask whether any rational distinction could be drawn between a needy family whose father works 35 hours per week rather than 34 hours per week. But plaintiffs overstate their question and thus the case. Congress, by legislating as it has, has distinguished between the unemployed and the underemployed, and has applied different solutions to the problems of each group. The 35 hour limitation happens to be the breakpoint between the two groups, and such a dividing line was within the discretion granted by Congress to the Secretary of HEW as discussed in part 3, a, above. The question thus becomes whether Congress could rationally have distinguished "employed" heads of unbroken families (which do not receive benefits under section 607) from "unemployed" heads of unbroken families (which do receive benefits under section 607) and employed or unemployed heads of broken families (which receive benefits under section 606).

An "employed" father in most cases will earn an amount above the AFDC grant. Only in circumstances like that in which the Macias and Tarin families find themselves, *i. e.*, with wage rates near the bottom of the minimum wage scale plus large families, will the hourly-

based classification require a result inconsistent with a straight need-evaluation system.[8]

The AFDC scheme established by Congress is in part incomplete when judged against a need standard. But we note that this "gap" in coverage was narrowed, although not eliminated through an expansion of the AFDC program. Until 1961 only "broken" families qualified for AFDC payments under 42 U.S.C. § 606. See King v. Smith, *supra.* When section 607 was added, unbroken families became eligible, but only if the father was "unemployed." See part 3.a. *supra.* As the Court said in Williamson v. Lee Optical Co., 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563:

> "Evils in the same field may be of different dimensions and proportions, requiring different remedies. * * Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. * * The legislature may select one phase of one field and apply a remedy there, neglecting the others. * * *" *(Id.* at 489, 75 S.Ct. at 465.)

See also McDonald v. Board of Election Commissioners of Chicago, *supra,* 394 U.S. at 809, 89 S.Ct. at 1409, which quotes from *Williamson* and then continues by indicating that "a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."

Here the congressional retention, or creation, depending upon one's point of view, of this particular lacuna in AFDC coverage may be explained by pointing to congressional efforts to maintain adequate wages for employed people through such devices as minimum wage laws [9] and collective bargaining rights.[10]

---

8. Plaintiffs' complaint alleges that Hawaii has a state-supported program for such "underemployed" people and that it covers less than one-half of one percent of the total welfare caseload.

9. See The Fair Labor Standards Act, 29 U.S.C. §§ 201–219.

10. See The Labor-Management Relations Act, 29 U.S.C. §§ 141–187.

These and similar efforts on behalf of employed people provide a rational basis for excepting employed fathers from the coverage of section 607. As the circumstances of the Macias and Tarin families demonstrate, congressional efforts for the employed can fail in some specific cases to come up to general AFDC standards. But *McDonald* and *Williamson* indicate to us that Congress can constitutionally approach a problem from two different directions, even though its action produces inequality at the interface of the two efforts. The challenged statutes and regulations are constitutional.

Plaintiffs cite Anderson v. Schaefer, N.D.Ga., 1968, Civ. No. 10443, in support of their claims. *Anderson* dealt with an "employable mother" regulation. Georgia had attempted to distinguish between earned income from employment and income from investments or other benefit sources by reducing AFDC payments at a greater rate respecting earned income from employment. The court held, and properly we think, that where the classification is based on income, the source of the dollars is immaterial in light of the purposes of the Social Security Act. Georgia also had attempted to treat differently income from *full-time* employment. This attempt was also rejected by the court. We accept this phase of *Anderson* as well, since *Anderson* dealt with a mother who headed a family alone and thus was covered by section 606 where need and income along with death or absence from the home of a parent are the tests for eligibility. But the full-time aspects of *Anderson* cannot be carried over *in toto* to this case since we here have a family where both parents are present in the home, a situation which is covered by section 607, not section 606. Section 607 specifically uses "unemployment" as a factor where section 606 does not, and this disparity in factors may be readily explained by the fact that a mother or other single parent who works full-time may have heavy child-care expenses which would so affect the broken family's otherwise disposable income that supplemental payments may very often be necessary.

Our conclusions make it unnecessary to decide whether this is a proper class action under Rule 23, F.R.Civ.P.

No fact issues have been presented, and apparently plaintiffs could not amend their complaint to state a stronger case.

The motion to dismiss is granted, without leave to amend. The action must be dismissed.