OPINION OF THE JUSTICES TO THE HOUSE
OF REPRESENTATIVES.

*Constitutional Law,* Delegation of powers, Due process of law, Equal protection of laws. *Public Welfare.*

A pending legislative bill proposing to strike out the provision of G. L. c. 117, § 1, which provided criteria for administration by the Department of Public Welfare of the general relief program of the Commonwealth under c. 117 for all residents in need, and to substitute a requirement that "[t]he Commonwealth . . . shall provide assistance to residents . . . found by the department to be eligible for such assistance in accordance with" c. 117, and further setting out a number of specific classes of persons who would be ineligible for assistance, by inference left financial need as the only test for relief for eligible persons, and the bill would not confer an improper delegation of power on the department in violation of art. 30 of the Declaration of Rights of the Massachusetts Constitution, notwithstanding failure of the bill to prescribe the contours of a general standard of need, tradi-

tionally determined by the department under the mandate of G. L. c. 18 to provide "fair, just and equitable," welfare services, and notwithstanding failure to require providing recipients with sufficient assistance "to maintain an adequate standard of living." [834-837]

A pending legislative bill proposing to strike out the provision of G. L. c. 118E, § 6, which listed categories of medical care and services for eligible needy residents for which the Department of Public Welfare was required to provide financial assistance, and to substitute a requirement that "[t]he department shall provide financial assistance for such medical care or services as . . . Title XIX [of the Social Security Act] and regulations adopted thereunder by the Secretary of Health, Education and Welfare require," involves no delegation of authority [837-839]; a further provision of the bill that "[t]he department may provide financial assistance for such additional medical care or services as said Title XIX and said regulations permit" would not confer a delegation of discretion on the department offensive to the Massachusetts Constitution in view of the guidelines and safeguards provided by §§ 3 and 4 of G. L. c. 118E and by Federal law [839-840].

Pending legislation proposing to amend G. L. c. 117, § 4, by excluding from the general assistance program of that chapter certain unemployed parents who have applied for, but are ineligible for, assistance under c. 118, governing Massachusetts Aid to Families with Dependent Children, merely alters the eligibility standards of the wholly State funded general assistance program and would not violate Federal law. [841-842]

In a pending legislative bill intended to limit the resources of the Commonwealth to be allocated to its public assistance programs and proposing to strike out the provision of G. L. c. 117, § 1, which extended to "all" residents in need and to substitute assistance only to residents "found by the department [of Public Welfare] to be eligible . . . in accordance with this chapter," a further proposal to amend § 4 of c. 117 by excluding from assistance thereunder "[a] person who has no dependent children and who is determined by the department . . . to be employable" is a rational method of accomplishing the bill's objective and is free from invidious discrimination which would violate the constitutional guaranties of due process and equal protection. [843-849]

On July 29, 1975, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to the questions set forth in an order adopted by the House of Representatives on June 25, 1975, and transmitted to us on July 2, 1975. The order recites the pendency before the House of a bill, House No. 6092, Appendix A, entitled, "An Act to further regulate certain programs of financial and medical assistance." It is stated that "[g]rave doubt exists as to the constitutionality of said bill, if enacted into law." A copy of the bill was attached to the order. The bill proposes, inter alia, certain amendments to §§ 1 and 4 of c. 117, and § 6 of c. 118E, of the General Laws, and these particular amendments are the occasion of the questions which are:

"1. Would the provisions of section 1 of said House, No. 6092, Appendix A, which delegate to the department of public welfare the power to determine eligibility for assistance without establishing any guidelines therefor be in violation of Article XXX of Part the First of the Constitution of the Commonwealth providing for the separation of the Legislative, Executive and Judicial departments?

"2. Would the provisions of section 2 of said House, No. 6092, Appendix A, making certain unemployed parents ineligible for assistance be in violation of the federal statutes in view of the decision in Paul R. Philbrook etc. Appellant vs. Jean Glodgett et al and Caspar W. Weinberger, Secretary of Health, Education and Welfare, Appellant vs. Jean Glodgett et al United States Supreme Court No. 74-1820 and 74-132 — June 9, 1975?

"3. Would the provisions of said section 2 of said House, No. 6092, Appendix A, making a person who has no dependent children and who is determined by the department in accordance with its regulations to be employable ineligible for assistance under chapter 117 of the General Laws be in violation of the Due Process Clause and of the Equal Protection Clause in view of the

decision in Morales vs. Winter, United States Court of Appeals for the First Circuit?[1]

"4. Would the provisions of section 6 of said House, No. 6092, Appendix A, which delegate to the department of public welfare the power to provide financial assistance for such medical care or services as said Title XIX and regulations adopted thereunder by the Secretary of Health, Education and Welfare require, without any further guidelines, be in violation of Article XXX of Part the First of the Constitution of the Commonwealth providing for the separation of the Legislative, Executive and Judicial departments?"

In response to our invitation to interested persons to file briefs, briefs were received from the Governor of the Commonwealth, the Secretary of the Executive Office of Human Services, the Commissioner of Public Welfare, Action for Boston Community Development, Inc., Western Massachusetts Legal Services, the Boston Legal Assistance Project, Massachusetts Law Reform Institute (the latter three on behalf of various individuals and welfare rights organizations), and Jack H. Backman as an individual.

1. Questions 1 and 4 may be treated together since each is concerned with whether a particular delegation of power to the Department of Public Welfare (the department) would violate the separation of powers guaranty of art. 30 of our Declaration of Rights. In each case the question asks if the delegation would be proper without further guidelines set forth in the statute.

The principles governing the permissible extent of a delegation of legislative power to an administrative agency have often been stated by this court. One recurrent theme is that specific standards need not be set out in the statute where the agency can find general guidance in the purposes and over-all scheme of the statute. A typical formulation of

---

[1] The correct title of the case referred to is *Morales* v. *Minter*, 393 F. Supp. 88 (D. Mass. 1975) (three-judge District Court).

the test is that which appears in *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 544 (1965): "The standards for action to carry out a declared legislative policy may be found not only in the express provisions of a statute but also in its necessary implications. The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required. The Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature." See *Commonwealth* v. *Hudson,* 315 Mass. 335, 341-342 (1943); *Commonwealth* v. *Diaz,* 326 Mass. 525, 527-528 (1950); *Opinion of the Justices,* 334 Mass. 721, 743 (1956); *Corning Glass Works* v. *Ann & Hope, Inc. of Danvers,* 363 Mass. 409, 421-422 (1973), and cases cited; Cooper, State Administrative Law, 68-69 (1965). As will appear more fully below, we believe that sufficient guidelines may be gleaned from an examination of the statutory framework and purposes surrounding each of these two proposed amendments to bring them within this principle.

Question 1 refers to a proposal in § 1 of House Bill No. 6092, Appendix A, to rewrite the first paragraph of § 1 of c. 117, as most recently amended through St. 1974, c. 623, § 2, the Commonwealth's so called General Relief (GR) program. As presently written, c. 117, § 1, provides that the Commonwealth, acting through the department, "shall assist, to the extent practicable, all poor and indigent persons residing therein, whenever they stand in need of such assistance. The aid furnished shall be determined by the department on the basis of the circumstances surrounding each application, shall be sufficient to maintain an adequate standard of living for the poor and indigent applicant and his immediate family who are eligible as hereinafter provided, [and] shall be in an amount to be determined in accordance with budgetary standards of the department . . .." This language may be contrasted with that which would replace it were the bill to be adopted: "The commonwealth, acting by and through the department of

public welfare, shall provide assistance to residents of the commonwealth found by the department to be eligible for such assistance in accordance with this chapter." The argument is made by some of the amici that adoption of this amendment would delegate to the department complete authority to devise any relief program it desired, giving it unbridled discretion to determine who would be eligible for benefits and what benefits would be provided. We believe this argument overlooks a number of significant guidelines and safeguards which emerge from consideration of c. 117 as a whole, particularly when read together with c. 18, which establishes the Department of Public Welfare.

We look first to § 2 of the bill, which would amend c. 117, § 4, by setting out a number of specific classes of persons who would be ineligible for GR benefits. Although § 4 includes no description of those who are eligible, there can be no doubt that the only test for those not declared to be ineligible is financial need. Any other possible criteria are eliminated if only by way of negative inference from the exclusions in § 4. This conclusion finds further support in the traditional purpose of c. 117 as a relief program for all those in need, and from the manifest object of the proposed amendment to restrict the scope of c. 117 only in specified areas.

That the proposed bill fails to prescribe the contours of a general standard of need does not render it invalid. In fact, the department is required by G. L. c. 18, § 2 (B) (g), to formulate a standard budget of assistance, the adequacy of which is reviewable annually. This is not an improper delegation of authority. See *Massachusetts Housing Fin. Agency* v. *New England Merch. Natl. Bank,* 356 Mass. 202, 214 (1969) (upholding delegation to agency to determine what constitutes "low income"). The department has traditionally determined the standard of need for recipients and undoubtedly has developed an expertise in the complexities of this matter. See *McNamara* v. *Director of Civil Serv.* 330 Mass. 22, 27 (1953); Cooper, State Administrative Law, 75-79, 83-84 (1965). Its discretion in determining the

standard of need and, hence, the eligibility test for GR, is circumscribed through a number of devices. For example, its provision of welfare services must be "fair, just and equitable." G. L. c. 18, § 2 (B) (d). Any potential for arbitrariness is checked by ensuring the opportunity for judicial review of regulations promulgated under the authority of G. L. c. 18, § 10, and for review of individual determinations of ineligibility. G. L. c. 18, § 16; c. 30A, §§ 7, 14. See Davis, Administrative Law, § 2.00-5 (Supp. 1970); Cooper, State Administrative Law, *supra*, at 81-82.

Objection is made that under the proposed amendment the department is no longer required to provide recipients with sufficient assistance "to maintain an adequate standard of living." While this is true, the result is not to give the department untrammeled discretion to decide what benefits to provide. Rather the Legislature, in determining the amount of the appropriation for c. 117, makes the critical choice with regard to the level of benefits. With whatever funds it has available, the department is charged with formulating "the policies, procedures and rules necessary for the full and efficient implementation" of the GR program. G. L. c. 18, § 2 (B) (a). Allocation of assistance payments among those eligible must be on "a fair, just and equitable basis" (G. L. c. 18, § 2 (B) (d)), and, as mentioned, this determination will be subject to judicial review to safeguard against arbitrariness. In short, we have no doubt that the delegation to the department contained in § 1 of the bill would not exceed the constitutional limit. Accordingly we answer question 1, "No."

Question 4 refers to a proposal in § 6 of House Bill No. 6092, Appendix A, to amend G. L. c. 118E, § 6, as most recently amended by St. 1973, c. 1068, § 2. Chapter 118E establishes a program of medical care and services to needy residents of the Commonwealth. As presently written, § 6 of c. 118E lists seventeen categories of services for which the department is required to provide financial assistance to those eligible. Certain of these categories of services are mandatory if the State is to receive Federal matching grants

under Title XIX of the Social Security Act. 42 U. S. C.
§§ 1396a (13) (B), 1396d (a) (1)-(5) (1970). Other
categories are optional; that is, the Federal government will
reimburse the States if they choose to provide the service but
they are not required to do so. The proposed amendment to
§ 6 would delete the requirement that all seventeen services
be provided and would instead require only that the depart-
ment provide assistance for those services which are man-
datory under Title XIX and the regulations promulgated
thereunder by the Secretary of Health, Education and
Welfare (HEW). Obviously there is no delegation problem
here since the department has no choice but to follow the
very specific Federal requirements.[2] In addition to the
language of the amendment, see G. L. c. 118E, §§ 1, 3;
c. 18, § 10. The difficulty lies in the discretion delegated to
the department by the following language of the proposed
amendment: "The department may provide financial
assistance for such additional medical care or services as said
Title XIX and said regulations permit."

In concluding that this delegation is a proper one, we em-
phasize that the Legislature is permitted to delegate to an
administrative agency the authority to determine how to
spend funds appropriated for a general purpose so as best to
carry out that purpose. This theme received extensive
treatment in *Opinion of the Justices*, 302 Mass. 605, 615-616
(1939): "[It is] clear that the General Court in the exercise
of its legislative power of appropriation has a broad scope
for determining whether it will prescribe in detail the par-
ticular purposes for which money appropriated shall be ex-
pended or, on the other hand, will permit executive or ad-
ministrative officers or boards to exercise judgment and
discretion within a wide field in the expenditure of money

--------

[2] The department would have discretion, however, with respect to the
services to be provided to low income persons who are not eligible for the
Federal categorical assistance programs. The Federal requirement with
respect to these persons is only that seven of the sixteen specified Federal
services be included in the plan; thus, no single category of medical ser-
vice is mandatory. 42 U. S. C. § 1396a (13) (C) (ii) (1970).

appropriated for a given object to accomplish the general purposes of the appropriation. The choice of the latter alternative has been made frequently. . . . Such a choice — at least within reasonable limits — does not amount to an unconstitutional delegation of legislative power. The General Court merely leaves to executive officers or boards the question of administration as to the means by which the object of an appropriation may be accomplished."

The argument is made that c. 118E contains no expression of legislative purpose to guide the department in exercising its discretion. But §§ 3 and 4 of c. 118E indicate that the department is bound to formulate its policies with two considerations in particular in mind: "the best interests of the recipients" and the limit of "available funds appropriated for the purposes of this chapter." Also, since the medical assistance program is to be administered in conformity with the provisions of Title XIX of the Social Security Act (G. L. c. 118E, § 1), we may look further to the Federal law for guidelines. See *Massachusetts Bay Transp. Authy.* v. *Boston Safe Deposit & Trust Co.* 348 Mass. 538, 546 (1965).

The purpose of Title XIX is stated to be to enable each State "as far as practicable" to provide medical assistance to its needy citizens. 42 U. S. C. § 1396 (1970). This comports with the considerations mentioned above. Federal law further requires that the State establish reasonable standards for determining the extent of medical assistance which are consistent with the objectives of Title XIX. 42 U. S. C. § 1396a (17) (1970). To this end HEW regulations require that the State plan "[s]pecify the amount and/or duration of each item of medical care or service that will be provided. . . ." 45 C. F. R. (1974) § 249.10 (a) (5) (i). See G. L. c. 118E, § 6, cl. 2. This means that if the proposed amendment is adopted the department's choice as to which of the optional services it will provide will necessarily be set out in departmental rules and regulations, and, hence, subject to full review. G. L. c. 30A, §§ 3, 7. As to individual determinations of eligibility for medical assistance, see G. L.

c. 18, § 16; c. 118E, §§ 9, 22. Moreover, under the HEW regulations, the items to be provided "must be sufficient in amount, duration and scope to reasonably achieve their purpose." 45 C. F. R. (1974) § 249.10 (a) (5) (i). This latter requirement adds a meaningful check on the department's discretion in choosing which items of medical service to include in the plan.

Some of the amici place great emphasis on the significant and technical policy decisions which must be made before settling on which of the optional services should be provided. Undoubtedly an intelligent decision would be based on a detailed understanding of the relationships among the various services, their costs, and their effectiveness. But the complexity of the decision-making process is not the litmus paper for testing the validity of a legislative delegation of authority. The department is in as good a position, if not a better one, as the Legislature to evaluate all the factors going into the determination of how best to provide for the medical care of the needy within the constraint of a limited budget.[3] In fact, the department has been charged with this responsibility in the past, not with respect to specifying the particular services available but as to establishing the "amount, duration and scope" of all the categories of medical care and services. G. L. c. 118E, § 6, cl. 2. In light of the manifest purposes of the legislation and the safeguards against arbitrary decision making, we believe the delegation contained in § 6 of House Bill No. 6092, Appendix A, would not offend the Constitution of the Commonwealth. Our answer to question 4 is, "No."

---

[3] The amici rely on *Dimery* v. *Department of Social Serv. of Iowa,* 320 F. Supp. 1125 (S. D. Iowa, 1969), vacated and remanded on other grounds, 398 U. S. 322 (1970). However, the court's holding in that case went no further than finding an improper delegation in giving the welfare department authority to set eligibility standards relative to the State's medical assistance program which were more restrictive than those specifically established by the Legislature. In so far as the implications of the court's reasoning may extend beyond the holding in the case, we decline to adopt that reasoning here.

2. Question 2 refers us to the provisions in § 2 of House Bill No. 6092, Appendix A, making certain unemployed parents ineligible for assistance under c. 117. The pertinent sentence reads as follows: "A person who has applied to the department for assistance under chapter one hundred and eighteen as an unemployed parent and who would be eligible for such assistance under said chapter but for the waiting period of thirty days required by federal law shall not be eligible for assistance under this chapter." A brief explanation of the framework of c. 118 is necessary.

Chapter 118 sets out the provisions of the Massachusetts Aid to Families with Dependent Children (AFDC) program. This program is administered so as to qualify the State for Federal grants under Title IV of the Social Security Act, 42 U. S. C. §§ 601-644 (1970). Assistance under AFDC is available to families with a "dependent child," defined to include a needy child deprived of parental support or care by reason of "the unemployment . . . of his father." 42 U. S. C. § 607 (a) (1970). G. L. c. 118, § 1. To be eligible under the Federal law, however, the father must have been unemployed for at least thirty days prior to receipt of any assistance. 42 U. S.C. § 607 (b) (1) (A) (1970). Since a family might be in need of assistance during this thirty-day period yet ineligible for AFDC benefits, assistance would presently be available under the provisions of c. 117, the General Relief program. Under the proposed amendment to c. 117, § 4, GR benefits would be denied in this situation.

The question asked of us is only whether this section of the bill would violate Federal statutes in view of the Supreme Court's decision in *Philbrook* v. *Glodgett*, 421 U. S. 707 (1975). The *Philbrook* case involved the narrow issue whether a Vermont regulation concerning that State's administration of the "unemployed father" portion of AFDC conflicted with Federal law. Although the court struck down the regulation, it requires very little discussion to reach the conclusion that there is nothing in the *Philbrook* decision or the Social Security Act to prevent the

Legislature from enacting the provision in question here. The proposal with which we are concerned has absolutely no effect on the Commonwealth's administration of AFDC or any other Federal program. Rather, it amends the eligibility standards of a wholly State funded general assistance program. Of course c. 117 is subject to all Federal constitutional requirements (*Pease* v. *Hansen*, 404 U. S. 70 [1971]), and we express no opinion on the constitutionality of this portion of the bill. But it is clear that a State is entitled to spend its own funds for welfare purposes without Federal statutory constraints. *Rosado* v. *Wyman*, 397 U. S. 397, 420 (1970). We answer question 2, "No."

3. The third question relates to another exclusion from General Relief benefits proposed in § 2 of House Bill No. 6092, Appendix A. The final sentence of § 2 would amend c. 117 to provide that "[a] person who has no dependent children and who is determined by the department in accordance with its regulations to be employable shall not be eligible for assistance under this chapter." We are asked whether this exclusion violates the constitutional guaranties of due process and equal protection, particularly in view of the decision in *Morales* v. *Minter*, 393 F. Supp. 88 (D. Mass. 1975). In examining this issue, we are mindful of the principle that "[t]here is no presumption of validity when we consider a proposed statute in an advisory opinion." *Opinion of the Justices*, 345 Mass. 780, 781-782 (1963).

In the *Morales* case, the plaintiffs challenged the constitutionality of the requirement in G. L. c. 117, § 4, that applicants for GR be between the ages of eighteen and sixty-five years. The court agreed with the contentions of the plaintiffs and struck down the statute on due process and equal protection grounds.

The court's reasoning was based primarily on the thesis that the statute created an "irrebuttable presumption" in violation of the due process clause. See *Stanley* v. *Illinois*, 405 U. S. 645, 657-658 (1972); *Vlandis* v. *Kline*, 412 U. S. 441, 452 (1973); *United States Dept. of Agriculture* v.

*Murry,* 413 U. S. 508, 514 (1973); *Cleveland Bd. of Educ.* v.
*LaFleur,* 414 U. S. 632, 644-648 (1974); *Fiorentino* v. *Pro-
bate Court,* 365 Mass. 13, 24-25 (1974); *Milton* v. *Civil
Serv. Commn.* 365 Mass. 368 (1974). Under G. L. c. 117,
§ 1, assistance is to be made available to "all poor and in-
digent persons residing . . . [in the Commonwealth]
whenever they stand in need of assistance." Relying prin-
cipally on this provision, the court in the *Morales* case found
that the age restrictions in § 4 established a "conclusive and
irrebuttable presumption," with no opportunity for an in-
dividualized determination, that persons under eighteen or
over sixty-five were not in need of financial assistance from
the Commonwealth. Because that presumption was "not
necessarily or universally true" (*Vlandis* v. *Kline, supra*),
the court concluded that §.4 violated due process.

Without questioning the court's reasoning in the *Morales*
case, we believe that the proposal before us stands on a dif-
ferent footing from the age restrictions considered by the
court in *Morales.* Most important to our analysis is the fact
that § 1 of the bill would completely rewrite the first
paragraph of G. L. c. 117, § 1. No longer would the Com-
monwealth purport to assist *all* its residents in need of
assistance. Instead, GR benefits would be available only to
those residents "found by the department to be eligible for
such assistance in accordance with this chapter." There can
be no doubt that the bill is aimed at replacing the standard
of eligibility based solely on need as presently contained in
c. 117, § 1. The Governor's message submitted with the bill
explains that "[o]ur intention in redefining eligibility for
General Relief is to make it clear that General Relief
henceforth cannot be expected to meet the needs of every
person in the Commonwealth with a demonstrable need,
regardless of that person's other characteristics or his
employment situation." It is thus apparent that were the
bill to be adopted, the amended statute could not be said to
presume that any persons excluded from coverage are not in
fact needy. Consequently, we are not faced with the ques-
tion whether it is "necessarily or universally true" that
"employable" persons are not in need of assistance.

Moving beyond this consideration, we are also of opinion that the irrebuttable presumption analysis is not an appropriate gauge of the constitutionality of a statute such as that proposed in House Bill No. 6092, Appendix A. This conclusion is based on the very recent opinion of the Supreme Court in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), which was decided subsequent to the *Morales* case. The issue in the *Salfi* case was the constitutionality of a provision in the Social Security act to the effect that surviving wives and stepchildren of deceased wage earners would be eligible for insurance benefits only if their respective relationships with the deceased had begun at least nine months prior to his death. The lower court had determined that the purpose of the duration-of-relationship requirement was to prevent the use of sham marriages to secure Social Security payments. On that basis, the court found that the requirement conclusively presumed that marriages of less than nine months were entered into for the purpose of obtaining Social Security benefits. Since that presumption was not necessarily or universally true, the requirement was held to violate due process. On appeal, the Supreme Court reversed, and in the process thoroughly discussed the appropriate standard of review in cases challenging the constitutionality of welfare legislation. The court distinguished earlier "irrebuttable presumption" cases such as *Stanley* v. *Illinois, supra,* and *Cleveland Bd. of Educ.* v. *LaFleur, supra,* as having involved claims enjoying "constitutionally protected status." 422 U. S. at 772. By contrast, "a noncontractual claim to receive funds from the public treasury" does not enjoy such status. *Ibid.* The court observed that the Social Security benefits in issue were "available upon compliance with an objective criterion, one which the Legislature considered to bear a sufficiently close nexus with underlying policy objectives to be used as the test for eligibility . . . . [The plaintiffs were] completely free to present evidence that they . . . [met] the specified requirements; failing in this effort, their only constitutional claim is that the test they cannot meet is not so rationally

related to a legitimate legislative objective that it can be used to deprive them of benefits available to those who do satisfy that test." *Ibid.*

Viewed in this manner, a due process challenge to a statute conferring welfare benefits dovetails into the claim that the classification drawn by the statute between those eligible for benefits and those not eligible violates equal protection. See Note, 87 Harv. L. Rev. 1534, 1545 (1974). In either case, the question for the court is whether the eligibility test rationally furthers a legitimate State purpose. As was stated by the Supreme Court in *Dandridge* v. *Williams,* 397 U. S. 471, 485-487 (1970): "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78. . . . It is enough that the State's action be rationally based and free from invidious discrimination." See *Flemming* v. *Nestor,* 363 U. S. 603, 611 (1960); *Richardson* v. *Belcher,* 404 U. S. 78, 81 (1971); *Jefferson* v. *Hackney,* 406 U. S. 535, 546-547 (1972); *Weinberger* v. *Salfi, supra,* at 769; *Mobil Oil Corp.* v. *Attorney Gen.* 361 Mass. 401, 417 (1972); *Commonwealth* v. *Henry's Drywall Co. Inc.* 366 Mass. 539, 545 (1974).

With this test in mind, we turn to consideration of the validity of the proposal before us to exclude from GR benefits those persons who have no dependents and are determined by the Department of Public Welfare to be "employable." The principal objective of this proposed amendment is clear: to achieve what is thought to be a necessary allocation of finite State resources in a time of fiscal crisis. According to the Governor, "the simple fact is that the scope of the current [welfare] programs extends beyond the Commonwealth's ability to pay." There can be no doubt that the State has a valid interest in preserving the

fiscal integrity of its programs and that it may legitimately attempt to limit expenditures for public assistance programs. *Shapiro* v. *Thompson,* 394 U. S. 618, 633 (1969). *Dandridge* v. *Williams, supra,* at 487. *Morales* v. *Minter, supra,* at 100. The Legislature may properly conclude, for example, that an allocation of funds to a somewhat limited class of recipients is preferable to spreading those same funds among all potential recipients. Cf. *Dandridge* v. *Williams, supra,* at 479-480. We might add that we are aware of no constitutional obligation on the State to provide financial assistance to all its needy residents. In fact, in many States large numbers of needy persons are not entitled to any form of governmental cash benefit. LaFrance, Schroeder, Bennett & Boyd, Law of the Poor, §§ 305, 309 (1973).

Given the Commonwealth's objective of preserving the fiscal integrity of its welfare programs, the question is whether this particular exclusion is a rational means of accomplishing that objective, free from invidious discrimination. We cannot say that it is not. The general effect of this exclusion would appear to be to give favored treatment to the aged and the infirm (i.e., those not employable) and those with dependents. For the Legislature to conclude that these classes of potential recipients are the least able to bear the hardships of an inadequate standard of living would not be irrational. Cf. *Jefferson* v. *Hackney,* 406 U. S. 535, 549 (1972). Indeed, it is essentially this classification which appears in the Social Security Act which provides Federal assistance only for categorical programs available to the aged, the blind, the permanently and totally disabled, and the families of dependent children. We doubt that anyone would seriously challenge the constitutionality of the Social Security Act on the ground that able bodied persons without dependents are ineligible for Federal cash grants regardless of their financial need. This is not to say that "employable" persons would not in some cases be just as much in need of assistance as those deemed eligible for GR benefits under the proposed amendment.

Nor is it to deny that the general purpose of the Commonwealth's welfare programs is to assist needy persons. But, as discussed above, were the bill to be enacted the legislative intent could no longer be interpreted as that of assisting *all* needy persons. Contrast *Morales* v. *Minter, supra.* And among those persons with a genuine financial need, those who are employable[4] at least have the opportunity to meet that need on their own in the job market.[5] Furthermore, such persons receive the benefit of other governmental efforts on their behalf. If they are able to find employment, they will have the advantage of programs designed to ensure adequate wages through such devices as minimum wage laws and the protection of collective bargaining rights. G. L. c. 150A, c. 151. See *Macias* v. *Finch,* 324 F. Supp. 1252, 1260-1261 (N. D. Cal. 1970). If they cannot obtain employment the Commonwealth responds in part through a program for unemployment compensation. G. L. c. 151A, §§ 22, 24, 74. See *General Elec. Co.* v. *Director of the Div. of Employment Security,* 349 Mass. 207, 210-211 (1965). Also, as argued in the Governor's brief, State and Federal programs of public

---

[4] We assume, of course, that the regulations promulgated by the department to define the class of persons to be deemed "employable" would be written with this rationale in mind. Regulations which are arbitrary in light of the statutory purpose could be challenged at the appropriate time under G. L. c. 30A, §§ 3, 7. Furthermore, a determination that a particular individual is "employable" under the regulations and, hence, ineligible for GR benefits would be subject to procedural safeguards, including a hearing and the opportunity for judicial review. G. L. c. 18, § 16.

[5] *Mooney* v. *Pickett,* 4 Cal. 3d 669, 679-680 (1971), does not support the argument to the contrary. That case involved only the question whether a county regulation excluding "employable" unmarried persons from the general relief program conflicted with the statutory requirement that counties support "all . . . poor, indigent persons" residing therein. In striking down the regulation, the court merely rejected the contention that "employability" constituted an economic resource of such a character as to take employable persons out of the class of poor residents who must by statute be supported by the county. The court gave no indication that a statute restricting general relief to persons not employable would violate constitutional norms.

employment and manpower training are directed at assisting employable persons. These programs would not, of course, be of any aid to persons who are not employable. Thus, in light of the Commonwealth's asserted inability to provide assistance to all those in financial need, the eligibility restriction introduced by the bill does not appear to us to represent an irrational means to accomplish the Commonwealth's objectives.

In reaching this conclusion we are not insensitive to the serious implications of the measures proposed here. For a great many residents of the Commonwealth, the result may be extremely harsh. In a time of high unemployment, it may be little comfort indeed for persons genuinely in need to be told they are "employable" so that no relief is available. For such people, the effect of adopting this legislation could be to leave them with no source of income and nowhere to turn. As argued by some of the amici, this state of affairs represents a departure from a tradition of assisting all residents of the Commonwealth in need which dates back to colonial times. Colonial Laws (1890 ed.) 123, § 2. See St. 1788, c. 61; *Cohasset* v. *Scituate*, 309 Mass. 402, 405-408 (1941). Nevertheless, it is not our province to pass on the wisdom of proposed legislation. Our concern here is only with the constitutionality of this particular exclusion from the coverage of c. 117. We must emphasize that the Constitution does not require that the Legislature "choose between attacking every aspect of a problem or not attacking the problem at all" (*Dandridge* v. *Williams, supra*, at 486-487), but rather permits the Legislature to "select one phase of one field and apply a remedy there, neglecting the others." *Williamson* v. *Lee Optical of Okla. Inc.* 348 U. S. 483, 489 (1955). See *Mobil Oil Corp.* v. *Attorney Gen.* 361 Mass. 401, 416-417 (1972); *Commonwealth* v. *Henry's Drywall Co. Inc.* 366 Mass. 539, 546 (1974). Recognizing the Commonwealth's legitimate interest in limiting the resources to be allocated to its public assistance programs, we must conclude that the method proposed here to accomplish that end is rationally based and

free from invidious discrimination. Consequently, we answer question 3, "No."

In summary, we answer
question 1, "No";
question 2, "No";
question 3, "No";
question 4, "No".

> G. Joseph Tauro
> Paul C. Reardon
> Francis J. Quirico
> Robert Braucher
> Edward F. Hennessey
> Benjamin Kaplan
> Herbert P. Wilkins