**Stephanie KIPPERMAN, on behalf of Plaintiff and all persons similarly situated, Plaintiff,**

v.

**John McCONE et al., Defendants.**

**No. C–75–1211–CBR.**

United States District Court, N. D. California.

Oct. 26, 1976.

862

Kipperman, Shawn & Keker, William A. Brockett, Jr., Friedman & Sloan, Stanley J. Friedman, Marcus S. Topel, San Francisco, Cal., for plaintiff.

Dennis G. Linder, Irwin Goldbloom, Civ. Div., Dept. of Justice, Washington, D.C., James A. Bruen, Asst. U. S. Atty., San Francisco, Cal., for defendants United States and CIA.

Richard Ernst, Ernst & Daniels, San Francisco, Cal., Donald J. Cohn, James V. Kearney, Webster & Sheffield, New York City, for defendant J. Edward Day.

Jacqueline Swords, Cadwalader, Wickersham & Taft, New York City, Charles E. Hanger, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant James Schlesinger.

Plato Cacheris, Hundley & Cacheris, Washington, D.C., Alvin H. Goldstein, Jr., Tuckman, Goldstein & Phillips, San Francisco, Cal., for defendant John Mitchell.

Paul R. Haerle, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendant John McCone.

John G. Milano, Milano & Cimmet, San Francisco, Cal., Seymour Glanzer, Kenneth L. Adams, Washington, D.C., for defendant William Cotter.

Kenneth L. Adams, Dickstein, Shapiro & Morin, Washington, D.C., Martin Quinn, Pettit, Evers & Martin, San Francisco, Cal., for defendant Thomas Karamessines.

Charles R. Donnenfeld, Rodney F. Page, Cameron M. Blake, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., Stephen S. Mayne, Dinkelspiel, Pelavin, Steefel & Levitt, San Francisco, Cal., for defendant Richard Helms.

## SECOND CORRECTED MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

Plaintiff brought this action on her own behalf and on behalf of all those similarly situated against the United States of America and against numerous present and former federal officials. The original complaint alleged that during the period 1955 through 1973 defendants unlawfully opened the sealed first-class mail plaintiff and other members of the class sent to and received from persons in the Soviet Union, thereby depriving plaintiff and the class members of their rights to free speech, privacy, due process of law, freedom from unreasonable searches and seizures, and communication in private via the mails. Plaintiff sought declaratory and injunctive relief, compensatory and exemplary damages, plus costs of suit and a reasonable attorney's fee.

The events giving rise to this lawsuit were first aired publicly in the Report to the President by the Commission on CIA Activities Within the United States, also known as the Rockefeller Commission Report, submitted to the President on June 6, 1975. Chapter Nine of that Report describes in detail the mail surveillance program initiated by the Central Intelligence Agency ("CIA") during the 1950s for purposes of gathering intelligence. The most extensive operation was based in New York and monitored mail sent to and received from the Soviet Union. Other mail projects during the same period were centered in San Francisco, Hawaii and New Orleans, but lasted for far briefer periods. Only the New York project handled mail to or from the Soviet Union. The Rockefeller Commission Report establishes that top officials in the Central Intelligence Agency, the Post Office Department, the Federal Bureau of Investigation, and the Department of Justice were ultimately apprised of the existence of the mail intercept program.

While the mail intercept program was in operation, all mail to and from the Soviet Union routed through New York was scanned by employees of the Central Intelligence Agency. The intercept program involved examining the envelopes of some of the letters, photographing (or "covering") a portion of those examined, and opening a smaller number of letters and analyzing their contents. During the last full year of its operation, the Soviet Union mail intercept program handled approximately 4,350,000 items, examined the outside of more than 2,300,000 items, covered approximately 33,000 items, and opened and analyzed the contents of approximately 8,700 items. Rockefeller Commission Report, at 111.

After describing the inception and operation of the CIA's mail intercept program, the Rockefeller Commission Report concluded as follows:

"While in operation, the CIA's domestic mail opening programs were unlawful. United States statutes specifically forbid opening the mail.

"The mail openings also raise Constitutional questions under the Fourth Amendment guarantees against unreasonable search, and the scope of the New York project poses possible difficulties with the First Amendment rights of free speech and press.

"Mail cover operations (examining and copying of envelopes only) are legal when carried out in compliance with postal regulations on a limited and selective basis

involving matters of national security. The New York mail intercept did not meet these criteria.

"The nature and degree of assistance given by the CIA to the FBI in the New York mail project indicate that the primary purpose eventually became participation with the FBI in internal security functions. Accordingly, the CIA's participation was prohibited under the National Security Act." *Id.* at 115.

Following public disclosure of the existence of the mail intercept program, many individuals inquired of the CIA whether their correspondence to or from persons in other countries had been covered or opened. From January, 1975, to February 15, 1976, the CIA processed 5,518 such inquiries submitted pursuant to the Freedom of Information Act, 5 U.S.C. § 552, and 480 inquiries submitted pursuant to the Privacy Act, 5 U.S.C. § 552a. Supplemental Affidavit of Ethel Mendoza, Chief, Privacy Act Branch of the Counterintelligence Staff of the Central Intelligence Agency, executed February 25, 1976, at 1. A search of CIA's records disclosed that the names of 134 of those persons who made inquiry are contained in the mail intercept files. *Ibid.* A total of 566 letters and 222 mail covers were furnished to those 134 persons. Supplemental Affidavit of Ethel Mendoza, executed May 12, 1976. The remaining 5,864 persons were informed that their names do not appear in the Agency's mail intercept files.

Plaintiff was among those persons who submitted such a request for information. On May 20, 1975, the CIA informed plaintiff that it had no record of her name in the file index maintained for the mail intercept program. This was confirmed in a subsequent letter from the CIA dated June 3, 1975.

Plaintiff filed her original complaint with this Court on June 13, 1975, and, exercising her right under Rule 15(a) of the Federal Rules of Civil Procedure to file a First Amended Complaint without leave of court, filed an amended complaint on June 16,

1975. Each of the defendants moved to dismiss the complaint—advancing numerous arguments including lack of personal jurisdiction, lack of subject matter jurisdiction, lack of standing, improper venue, and sovereign immunity—or, in the alternative, for summary judgment. The Court twice permitted plaintiff to amend her complaint in her effort to oppose defendants' motions. The motions were argued at hearings held on February 9 and March 11, 1976.[1]

In her Third Amended Complaint, plaintiff invokes this Court's jurisdiction under 5 U.S.C. §§ 551 et seq., 28 U.S.C. § 1331, the First, Fourth, Fifth, Ninth and Tenth Amendments to the Constitution, United States statutes and postal regulations, and the doctrine of pendent jurisdiction. Count One of the Third Amended Complaint charges defendants with conspiring to deprive plaintiff and other members of the class of their rights and with invading their privacy by operating the mail intercept program described above during the period 1953–1973. The specific conduct complained of in Count One is the mail cover operation. Plaintiff charges as follows:

"On information and belief, said acts and course of conduct included but were not limited to, the copying of the exterior of the envelopes of private, sealed, first class mail of Plaintiff, and her class sent to and from persons in foreign countries, including, but not limited to, the Soviet Union and one or more Communist countries in the Far East. Said acts, as to Plaintiff, were directed at mail sent to and from persons in the Soviet Union.

\* \* \* \* \* \*

"On information and belief, said acts included, but were not limited to, the above-described copying of exteriors of envelopes, and the maintenance of files and dossiers and data banks reflecting the information unlawfully acquired about Plaintiff and her class, and the reporting of such information to others." Third Amended Complaint, at 7–8.

---

1. The Court had previously held numerous hearings on other aspects of this litigation.

Count Two of the Third Amended Complaint is virtually identical to Count One, except that it is concerned with the opening of mail. Count Three, in turn, focuses upon "the diversion of first-class mail sent by Plaintiff and her class to and from certain foreign countries, including, but not limited to the Soviet Union and Communist countries in the Far East. Said mail was diverted from its normal and unlawful [sic] flow, and was subject to unauthorized examination of the exterior of its envelopes, and the delay of such mail for the purpose of carrying out the unlawful examination described. As to Plaintiff, such acts were limited to mail sent to and received from persons in the Soviet Union." *Id.* at 12.

The Third Amended Complaint alleges that two overt acts occurred in this District in furtherance of the alleged conspiracy: (1) operating the Far East mail intercept program in San Francisco; and (2) utilizing United States letter carriers "to pick up Plaintiff's mail to the Soviet Union in this District, and to transport it within this District making possible its later examination, copying or opening." *Id.* at 6. As a result of the conduct complained of, plaintiff claims that she and her class have suffered shock, anger and mental distress; she further claims that their First Amendment rights "to speak, think and communicate their thoughts in writing to other persons" have been chilled and impaired. *Id.* at 8, 10 and 13.

The Court orally granted defendants' motions for summary judgment on the first two counts and dismissed the Third Amended Complaint at the March 11 hearing. Thereafter, because it wished to set forth the basis for its rulings in written form, the Court issued a Memorandum of Opinion and Order on April 28, 1976, and a Corrected Memorandum of Opinion and Order on June 24, 1976.[2]

As it explained in the Memorandum of Opinion,[3] the Court ordered summary judgment on Counts One and Two because it determined that there existed no genuine issue of material fact as to whether plaintiff's mail had been monitored during the period from 1953 through 1973. The Court based its conclusion upon the statements made in the affidavits of William E. Colby, Director of the CIA, and Ethel Mendoza, Chief of the Privacy Act Branch of the CIA's Counterintelligence Staff and custodian of the mail intercept files, which the Government submitted in support of its motions. In his affidavit, Mr. Colby states that all names and addresses gleaned from the exteriors of envelopes or the contents of letters while the mail intercept program was in operation have been cross-indexed and filed alphabetically in a microfilm program; that that program is the only comprehensive record of the names of individuals whose mail to or from the Soviet Union was intercepted; and that a search of that program would therefore be exhaustive. Mr. Colby further states that a general search of the CIA files for materials relevant to plaintiff, under both her maiden and married names, disclosed no documents or information, with the exception of the correspondence exchanged by plaintiff's counsel and the CIA concerning her request for information relating to the mail intercept program. Affidavit of William E. Colby, executed on January 12, 1976, at 2. In a Supplemental Affidavit executed on February 3, 1976, Mr. Colby states that, to the best of his knowledge, no materials relevant to the mail intercept program have been

---

2. The Court issued the Corrected Memorandum in response to plaintiff's May 7, 1976, Motion to Amend or to Reconsider which was granted at a hearing held on May 27, 1976. Although the Court did recharacterize its findings with respect to plaintiff's good faith in having commenced this action anonymously, its correction did not affect the conclusions of fact of law which underlay its order granting summary judgment to the defendants and dismissing the action. With the exception of this minor alteration, the two memoranda of opinion are identical. *Compare* Memorandum of Opinion, April 27, 1976, at 14, lines 3–13, *with* Corrected Memorandum of Opinion, June 24, 1976, at 14, lines 3–14.

3. All subsequent page references to the Court's Memorandum of Opinion refer to the Corrected Memorandum of Opinion of June 24, 1976.

destroyed, and that all such material is in existence and has been incorporated into the microfilm program described above. Ms. Mendoza, in turn, states in an affidavit executed on January 12, 1976, that the mail intercept records were diligently search on December 22, 1975, and again on January 12, 1976, and that neither search disclosed the existence of plaintiff's name in those records. The second search was personally conducted by Ms. Mendoza.

The Court noted that "if believed, [the affidavits] conclusively establish that plaintiff's mail was not monitored by the Central Intelligence Agency." Memorandum of Opinion at 8. Stressing the good faith which the CIA had shown in admitting monitoring activity to 134 persons who had made inquiries, and expressing its skepticism about the validity of the statistical analysis which plaintiff offered to controvert the affidavits, the Court found that it had "no reason to doubt the accuracy or veracity of the affidavits * * *." Ibid. The Court, therefore, ordered summary judgment in favor of the defendants, holding that "the record presently before [it] conclusively establishes that plaintiff was not among those persons whose letters to or from the Soviet Union were monitored by the Central Intelligence Agency." Id. at 12.

At the same time, the Court dismissed Count Three of the Third Amended Complaint, determining that its allegations concerning the delay of plaintiff's mail "are purely conjectural and do not state a claim for relief." Id. at 13. Finally, the Court ruled that plaintiff's claim with respect to the "chilling effect" of defendants' alleged conduct failed to state a cause of action under Laird v. Tatum, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Ibid.

Subsequent to the entry of the first Memorandum of Opinion, defendants United States and Bush notified the Court that

they had reason to believe that the affidavits of Mr. Colby and Ms. Mendoza were in error. They moved to vacate the judgment of the Court, pending their submission of a report to the Court, explaining and correcting any inaccuracies which might have appeared in either affidavit. The Court granted the motion to vacate at a hearing held on May 27, 1976.[4]

On June 7, 1976, defendants submitted such a report in the form of a memorandum prepared by Donald F. Chamberlain, Inspector General of the CIA. Dated June 4, 1976, a report from Mr. Chamberlain to the Director of the CIA confirms the defendants' fear that the affidavits were inaccurate. According to the report, Mr. Colby's assertion that the central index contains all of the names and addresses of individuals whose mail to or from the Soviet Union was either opened or covered during the operation of the Soviet intercept is erroneous. Report at 1. Rather, the report states that the index is an incomplete record. It indicates, first, that although the index reflects the vast majority of letters opened during the project's operation, some small fraction of opened letters escaped indexing. Id. at 6. It notes, second, that only a small percentage of letters covered by intercept agents, an estimated 359,418 of an estimated 2,709,597, are reflected in the index. Ibid.

At a hearing held on July 8, 1976, the parties joined issue as to the effect which this newly discovered information ought to have upon the Court's earlier ruling. Defendants argue that the previous order of summary judgment and dismissal should be reinstated, characterizing the likelihood that plaintiff's mail was monitored as "remote." Supplemental Memorandum of Points and Authorities of Defendants United States and Bush, filed July 26, 1976, at 4. Plaintiffs argue that a reinstatement of the

---

4. Defendants United States and Bush also moved the Court to correct the record to eliminate a typographical error in Ms. Mendoza's Supplemental Affidavit. Although her affidavit executed February 25, 1976, averred that 22 mail covers had been furnished upon request,

she executed a third affidavit on May 12, 1976, which states that the figure should read 222. The Court granted the motion to correct the record at the July 8 hearing, and the correction is reflected herein at 863–864.

order would be improper, because Mr. Chamberlain's report suggests that "it is *probable to highly probable* that [plaintiff's] mail was photographed and filed." Plaintiff's Response and Opposition to Defendants' Motions for Dismissal or for Summary Judgment (with Supplemental Affidavits), filed June 21, 1976, at 3 (emphasis in original).

■ Regardless of the degree to which this newly discovered information affects a probability calculation as to the likelihood that plaintiff's mail was monitored, the Court believes that it thoroughly undermines the basis for its previous order of summary judgment. At the time of the March 11, 1976, hearing, the Court possessed affidavits which, uncontradicted and believed, resolved conclusively the factual dispute. Presently, because the CIA admits that it has no comprehensive index of letters covered or opened during the Soviet intercept, the Court has no basis for concluding finally that plaintiff was not a target of the mail-monitoring program. Mr. Chamberlain's report breathes new life into the parties' longstanding dispute over whether or not plaintiff's mail was surveilled. Unable to conclude that the case presents no genuine issue of material fact, the Court declines to reinstate its order granting summary judgment on Counts One and Two of the Third Amended Complaint.

However, the defendants' recent submission does not disturb the bases for the Court's rulings on plaintiff's claims concerning the alleged delay of her mail or the alleged "chilling" of her exercise of her First Amendment rights. The Court will order dismissal of each. In addition, because plaintiff's request for injunctive relief was predicated on the "chilling" theory, and because she sought only injunctive relief against defendant Bush, the dismissal of the "chilling effect" claim logically mandates the dismissal of defendant Bush from this action. Because it was unnecessary in light of its decision to grant summary judgment, the Court did not previously order Mr. Bush's dismissal. It does so now.

Having failed to reinstate its summary judgment order, the Court once again faces the various motions for dismissal filed by the defendants in this case as they relate to Counts One and Two and to plaintiff's requests for monetary relief. The Court indicated in both the March 11 hearing and its Memorandum of Opinion at 13, n. 5, that it finds meritorious the defendants' objections to jurisdiction and venue in this case. At the July 8 hearing, the Court granted plaintiff's counsel's request to submit in memorandum form additional information which he believes relevant to a final determination on these issues, and it invited counsel for the defendants to reply to any such memorandum. Having considered the parties' recent submissions, as well as all of the many memoranda filed over the course of this suit, the Court has concluded that, for reasons discussed below, the action should be dismissed.

### Sovereign Immunity

Plaintiff names the United States a defendant in this action, alleging the Government liable

"for ratifying the acts of individual Defendants, or for being grossly negligent and remaining uninformed of the illegal character of said acts, or for intentionally remaining uninformed of the illegal character of these acts * * * [thereby] permit[ting] Defendants to carry out the acts complained of." Third Amended Complaint at 3.

Noting that plaintiff specified that she seeks only injunctive relief from defendant Bush, and that she did not so limit her request with respect to the Government, the Court assumes that she seeks damages from the United States. Defendant United States has moved for dismissal from the action, raising the bar of sovereign immunity.

■ It is axiomatic that the United States *eo nomine* may not be sued unless it has waived sovereign immunity. "Except as Congress has consented there is no jurisdiction in * * * any * * * court to entertain suits against the United States

\* \* \*." *United States v. Sherwood,* 312 U.S. 584, 588, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941) (citation omitted). In its recent decision in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court stressed that a waiver of sovereign immunity will not be implied, but must be explicitly stated. 424 U.S. 399, 96 S.Ct. 948. Thus, plaintiff must demonstrate explicit statutory authorization to bring this suit against the Government.

Plaintiff contends that two federal statutes[5]—that section of the Tucker Act now codified as 28 U.S.C. § 1346(a)(2) and those sections of the Administrative Procedure Act now codified as 5 U.S.C. §§ 701–706—provide such authority. The Court disagrees. 28 U.S.C. § 1346(a)(2) states:

"(a) the district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

\* \* \* \* \* \*

"(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

Plaintiff's assertion that this statute provides authority to sue the United States is doubly flawed. First, the statute plainly provides no jurisdiction in the district courts to entertain suits for damages in excess of $10,000, the amount which plaintiff has requested.

■ Second, the Court believes that the statute itself is a mere grant of jurisdiction to the district courts which, not supplemented by a clear statutory waiver, is insufficient to provide a right to sue the

United States for monetary relief. The Court bases its determination upon the Supreme Court's parallel interpretation of that section of the Tucker Act now codified as 28 U.S.C. § 1491 in *United States v. Testan, supra.* Except that it places no limit upon the available remedy, the grant of jurisdiction to the Court of Claims in 29 U.S.C. § 1491[6] is practically identical to that to the district courts in 28 U.S.C. § 1346(a)(2).

In *United States v. Testan, supra,* the Supreme Court faced the argument

"that the Tucker Act fundamentally waives sovereign immunity with respect to any claim invoking a constitutional provision or a federal statute or regulation, and makes available any and all generally accepted and important forms of redress, including money damages." 424 U.S. at 400, 96 S.Ct. at 954.

Characterizing as "unsound" the contention that money damages are of necessity available to redress the violation of substantive rights, the Supreme Court reiterated that the entitlement to damages from the federal government depends upon "whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Ibid.* (citations omitted). Labelling 28 U.S.C. § 1491 as "merely jurisdictional," *ibid.,* the Supreme Court declined to find that it provided any substantive right to sue the United States for monetary relief.

■ Believing that its interpretation of 28 U.S.C. § 1346(a)(2) is controlled by the Supreme Court's interpretation of the parallel language of 28 U.S.C. § 1491, the Court finds that § 1346(a)(2) cannot be construed to waive sovereign immunity in these circumstances. Thus, it proceeds to plaintiff's second argument.

---

**5.** Plaintiff has not pursued remedies under, and has disavowed any intent to rely upon, the Federal Torts Claims Act, 28 U.S.C. § 1346(b), a statute which clearly does authorize suits against the United States for certain kinds of activity.

**6.** 28 U.S.C. § 1491 states, in relevant part:

"The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

■ Plaintiff's assertion that the Administrative Procedure Act constitutes a waiver of sovereign immunity in these circumstances is likewise unconvincing.[7] Certainly Sections 701–706[8] of the Act have been construed by some courts to constitute a

7. The Court does not reach the question of whether, absent the bar of sovereign immunity, the Administrative Procedure Act would provide for review in this case.

8. Section 701 provides:

"(a) This chapter applies, according to the provisions thereof, except to the extent that—

"(1) statutes preclude judicial review; or

"(2) agency action is committed to agency discretion by law.

"(b) For the purpose of this chapter—

"(1) 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41; or sections 1622, 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

"(2) 'person', 'rule', 'order', 'license', 'sanction', 'relief', and 'agency action' have the meanings given them by section 551 of this title."

Section 702 provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Section 703 provides:

"The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement."

Section 704 provides:

"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."

Section 705 provides:

"When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."

Section 706 provides:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

"(1) compel agency action unlawfully withheld or unreasonably delayed; and

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

broad waiver of immunity by the federal government. *See Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859, 873–874 (1970); *Kletschka v. Driver,* 411 F.2d 436, 445 (2 Cir. 1969); *Estrada v. Ahrens,* 296 F.2d 690, 698 (5 Cir. 1961).[9]

The Court of Appeals for the Ninth Circuit has not, however, adopted the position that Sections 701–706 operate as a plenary waiver. In *Washington v. Udall,* 417 F.2d 1310 (9 Cir. 1969), while holding permissible a suit against an executive official for allegedly *ultra vires* activity, the Court of Appeals cautioned:

> " * * * we strongly emphasize our opinion that such review is *not* available on the theory that the Act constitutes a consent of the United States to all suits of whatever nature and, as such, a blanket waiver of sovereign immunity. * *

> "The Administrative Procedure Act may * * * provide a basis for review of governmental decisions if, and only if, the immunity doctrine is not so controlling so as to bar the suit." 417 F.2d at 1320 (emphasis in original).[10]

█ Plaintiff has not cited, and the Court has not discovered, any case holding that the Administrative Procedure Act waives sovereign immunity in a suit for money damages against the United States itself. Rather, an examination of the cases suggests that the doctrine of sovereign immunity retains its full vitality under such circumstances. *Scanwell Laboratories, Inc. v. Thomas,* 172 U.S.App.2d 281, 521 F.2d 941, 958 (1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761; *Warner v. Cox,* 487 F.2d 1301, 1304–1305 (5 Cir. 1974); *American Fed. of Gov. Employees v. Callaway,* 398 F.Supp. 176, 192 (N.D.Ala.1975).

Sensitive to the mandate of the Supreme Court in *United States v. Testan, supra,* 424 U.S. 392, 96 S.Ct. 948, that a waiver of sovereign immunity must be explicitly stated, mindful of the caution of the Court of Appeals for the Ninth Circuit in *Washington v. Udall, supra,* that the Administrative Procedure Act is not a plenary waiver, and influenced by its belief that such a holding would be unprecedented, the Court declines to find that the Administrative Procedure Act waives sovereign immunity in such a manner as to permit a suit against the United States itself for damages in excess of $10,000 to be brought in the district court.

Therefore, having dismissed plaintiff's cause of action for injunctive relief, and having found that her suit for damages against the United States is barred by the doctrine of sovereign immunity, the Court dismisses defendant United States from this suit.

### Lack of Personal Jurisdiction

Of the seven remaining defendants, only defendant McCone is a California resident. The six non-residents have moved for dismissal, contending that the Court lacks personal jurisdiction over them. Plaintiff argues that personal jurisdiction lies under both Section 1391(e) of Title 28 of the United States Code and Section 410.10 of the California Code of Civil Procedure.

Section 1391(e), which is discussed more extensively *infra* at 875–877, states:

> "A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or

**9.** Several circuits have adopted the contrary view that the Administrative Procedure Act is not a waiver of sovereign immunity. *See Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529 (8 Cir. 1967); *Chournos v. United States,* 335 F.2d 918 (10 Cir. 1964); *Cyrus v. United States,* 226 F.2d 416 (1 Cir. 1955).

**10.** The Court of Appeals for the Fourth Circuit took a similar position on the sovereign immunity question in *Littell v. Morton,* 445 F.2d 1207 (4 Cir. 1971).

(3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

"The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought."

Plaintiff cites a number of cases which might be read to suggest, without discussion, that the provision supplies personal jurisdiction over individuals who fall within its ambit. *E. g., Crowley v. United States*, 388 F.Supp. 981, 987 (E.D.Wis.1975); *Environmental Defense Fund, Inc. v. Froehlke*, 348 F.Supp. 338, 364 (W.D.Mo.1972), *aff'd on other grounds*, 477 F.2d 1033 (8 Cir. 1973); *English v. Town of Huntington*, 335 F.Supp. 1369, 1373 (E.D.N.Y.1970); *Macias v. Finch*, 324 F.Supp. 1252, 1254–1255 (N.D. Cal.1970).

█ The Court cannot agree that this provision automatically confers personal jurisdiction in cases to which it applies. Assuming that the defendants were served in accordance with its requirements, and that they are individuals who fall within the scope of the provision,[11] plaintiff would yet have to establish that the non-resident defendants had had the requisite contacts with the forum to warrant the exercise of personal jurisdiction by this Court. *See United States ex rel. Rudick v. Laird*, 412 F.2d 16, 20 (2 Cir. 1969), *cert. denied*, 396 U.S. 918, 90 S.Ct. 244, 24 L.Ed.2d 197 (1969); *United States ex rel. Armstrong v. Wheeler*, 321 F.Supp. 471, 476–478 (E.D.Pa. 1970). *See also Coleman v. American Export Isbrandtsen Lines, Inc.*, 405 F.2d 250, 251–253 (2 Cir. 1968). While Section 1391(e) makes possible the exercise of jurisdiction over individuals found beyond the territorial limits of the district court by providing a mechanism for effective service

of process, its invocation cannot dispel the need to determine whether the exercise of jurisdiction would comport with due process. Thus, the Court proceeds to plaintiff's second argument.

Section 410.10 of the California Code of Civil Procedure, the California long-arm statute, permits California courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." The statute grants California courts jurisdiction "coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court." *Threlkeld v. Tucker*, 496 F.2d 1101, 1103 (9 Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974) (footnote omitted). Thus, the nonresident defendants are subject to the jurisdiction of this Court if they satisfy the "minimum contacts" test adopted in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), as amplified by *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

In *International Shoe Co. v. Washington, supra*, the Supreme Court held that

" * * * due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158 (citations omitted).

In *Hanson v. Denckla, supra*, the Supreme Court explained that the "minimum contacts" test demands

" * * * some act by which the defendant purpose[ly] avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1240.

Summarizing and interpreting Supreme Court precedent, the California Supreme

---

11. For reasons discussed *infra* at 875–877, the Court does not believe that all of the defendants are parties who fall within the scope of the statute.

Court has recently explained that courts within the state are empowered to exercise jurisdiction over non-residents in either of two situations.

"If a nonresident defendant's activities may be described as 'extensive or wide-ranging' [citation omitted] or 'substantial . . . continuous and systematic' [citation omitted], there is a constitutionally sufficient relationship to warrant jurisdiction for all causes of action asserted against him. In such circumstances, it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum.

"If, however, the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him, then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action. In such a situation, the cause of action must arise out of an act done or transaction consummated in the forum, or defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. Thus, as the relationship of the defendant with the state seeking to exercise jurisdiction over him grows more tenuous, the scope of jurisdiction also retracts, and fairness is assured by limiting the circumstances under which the plaintiff can compel him to appear and defend. The crucial inquiry concerns the character of defendant's activity in the forum, whether the cause of action arises out of or has a substantial connection with that activity, and upon the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction." *Cornelison v. Chaney*, 16 Cal.3d 143, 147, 127 Cal.Rptr. 352, 354–355, 545 P.2d 264, 266–267 (1976) (footnote omitted).

With the exception of Mr. Mitchell, all of the moving defendants have filed affidavits stating that none is a California resident, none has engaged in any substantial or continuous activity of any sort within California, and none has engaged in activities in the state which are related to plaintiff's allegations.[12] Plaintiff does not argue that the defendants have been so pervasively tied to the state as to justify the exercise of general jurisdiction. However, her counsel has extensively briefed and argued the proposition that the defendants have engaged in conduct connected with the Soviet mail intercept program in the Northern District of California which supports the exercise of personal jurisdiction by this Court in this case.

During the February 9 and March 11 hearings, the Court indicated that it found plaintiff's attempts to identify acts, sufficient to supply the requisite contact between the individual defendants and the forum, unconvincing. At that time, the Court was concerned only with the two acts named by plaintiff in her Third Amended Complaint[13]—(1) the routine collection and segregation of mail in San Francisco by local agents of the Postal Authority, and (2) the operation of the Far East Intercept by the CIA in San Francisco for short periods during the 1960s. In the Supplemental Affidavit submitted by plaintiff's counsel on July 13, 1976, plaintiff suggests one additional act: the operation of the "Source"

12. Affidavit of William J. Cotter, executed January 2, 1976; Affidavit of J. Edward Day, executed December 30, 1975; Affidavit of Richard Helms, executed January 6, 1976; Affidavit of Thomas Karamessines, executed January 12, 1976; Affidavit of James R. Schlesinger, executed January 12, 1976.

13. Plaintiff previously attempted to identify a third act which occurred in this state. Characterizing private mail as a conduit—commencing at the point of mailing and continuing through delivery to an addressee—she argued that an interception at any point creates an injury, and thus constitutes an act, at the place of mailing. Because plaintiff asserts that she mailed most of her letters from San Francisco, she argued that the injury occurred here. The Court rejected the conduit theory, agreeing with defense counsel that the act of interception occurs at the place of interception, rather than at the place of mailing. *See* Transcript of Hearing, February 9, 1976.

project by the Federal Bureau of Investigation ("F.B.I.") in San Francisco for periods prior to and until 1966.

■ The Court rejects plaintiff's assertion that the activities of local postal officials preceding the transmission of Soviet-bound mail to New York during the operation of the Soviet Intercept affords a basis for exercising personal jurisdiction over the non-residents. It is obvious that the collection and transmission of the mail to New York City was a prerequisite to the mail's being surveilled in New York. However, the Rockefeller Report does not establish, and plaintiff offers no factual evidence which justifies the conclusion, that Soviet-bound mail was handled irregularly in San Francisco, or that local activity was altered, in order to facilitate the East Coast Intercept. The normative activities of the local federal postal authorities are not meaningfully related to the intercept program such that plaintiff's cause of action could be said to arise from those activities.[14]

■ The Court also rejects the contention that the operation of the CIA's West Coast Mail Intercept in San Francisco for several two to three week periods during 1969, 1970, and 1971 supplies it with jurisdiction over the non-resident defendants. Chapter Nine of the Rockefeller Report does not suggest, nor does plaintiff argue, that mail to or from the Soviet Union was targeted by the West Coast Intercept.

Rather, the Report suggests that, among the CIA mail intercept programs, only the New York project surveilled mail to or from the Soviet Union. Therefore, whatever may have been the complicity of any of the named defendants in the West Coast Intercept, such complicity would not constitute an act from which either of plaintiff's remaining causes of action might be said to have arisen. For, whoever may have been injured by the interception of mail to and from the Far East during the operation of the San Francisco-based project, plaintiff—who cannot allege that she corresponded with individuals in these countries during the relevant time periods—was not.

The Court finds plaintiff's denotation of the mail intercept project conducted by the Federal Bureau of Investigation in San Francisco deficient as a basis for the exercise of personal jurisdiction over the defendants for the same reasons.[15] Plaintiff refers to the projects conducted in San Francisco during interim periods from the mid-1950s until 1966, which were recently investigated by the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities.

In reviewing the transcripts of the hearings concerning F.B.I. mail-opening activities which the Select Committee conducted in October, 1975, counsel for plaintiff was troubled that a number of the government memoranda studied by the Committee did

---

14. Even if local activity had been altered, and the local postal authorities were named as and found to be co-conspirators in the East Coast Mail Intercept, this Court would not automatically acquire personal jurisdiction over the five non-resident defendants. Contrary to plaintiff's assertion that personal jurisdiction over alleged co-conspirators may be acquired vicariously through the forum-related conduct of any single conspirator, the Court believes that personal jurisdiction over any non-resident individual must be premised upon forum-related acts personally committed by the individual. Imputed conduct is a connection too tenuous to warrant the exercise of personal jurisdiction.

The Supreme Court has labelled "frivolous albeit ingenious", *Banker's Life and Cas. Co. v. Holland*, 346 U.S. 379, 384, 74 S.Ct. 145, 98 L.Ed. 106 (1953), and the vast majority of lower federal courts have rejected, *see California Clippers, Inc. v. United States S. F. Ass'n*, 314 F.Supp. 1057, 1066–1067 & n. 5 (N.D.Cal.1970), the theory of vicarious venue for alleged conspirators. That much more frivolous is the contention that personal jurisdiction, the exercise of which is governed by strict constitutional standards, may depend upon the imputed conduct of a co-conspirator. Any contrary suggestion in *Giusti v. Pyrotechnic Industries*, 156 F.2d 351 (9 Cir. 1956), has been strictly limited to apply only to corporate defendants. *California Clippers, Inc. v. United States S. F. Ass'n, supra*, 314 F.Supp. at 1067.

15. Although plaintiff's complaints have not referred to the F.B.I. mail intercepts as a basis for her cause of action, the Court believes that—in the interest of judicial efficiency and fairness to the parties to this suit—the issue ought be resolved at this time, rather than submitted in a Fourth Amended Complaint.

not clearly indicate the target countries of the San Francisco-based projects. He suggested that further discovery might indeed reveal that the San Francisco-based projects intercepted mail to or from the Soviet Union, and thus provide the necessary forum-related activity to support the exercise of personal jurisdiction. Affidavit of William A. Brockett, executed July 12, 1976, at 4.

However, the Court feels that the Final Report of the Select Committee dispels the doubt which the hearings might create. In its Final Report, the Committee indicates the nature of the mail surveilled in the four F.B.I. projects which operated in San Francisco. Although the Report notes that the various projects intercepted certain domestic mail and certain mail to and from a Far East Asian country, it offers no reasonable basis for believing or suspecting that the F.B.I. projects in San Francisco involved any surveillance of mail to or from the Soviet Union. See Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans, Book III of Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S.Rep.No.94–755, 94th Cong., 2d Sess., at 641–645. Thus, these projects too fail to constitute forum-related activity connected to plaintiff's causes of action.

Thus, in the final analysis, plaintiff cannot identify any act committed in this state by any of the non-resident defendants which is substantially related to the alleged interception of her mail to or from the Soviet Union in New York. However, she asserts that the Court may nonetheless exercise jurisdiction. She argues that, although the alleged intercept activity may not have transpired in California, the effects of that activity—the emotional stress which plaintiff suffered upon learning of the alleged invasion of her rights—did occur here. She urges that local effects provide a sufficient, independent basis for the exercise of personal jurisdiction.

At its outer limits, due process may allow a forum to exercise jurisdiction over a non-resident who causes effects in the forum state through acts done elsewhere, when those effects are either intended or reasonably foreseeable, "unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable." See Annot., Cal.Code Civ.Proc.Ann. § 410.10, at 472–474. At the very least, however, the effects must be of a nature that the state treats as exceptional and subjects to special regulation, or the non-resident must have invoked the benefits and protections of the forum's laws in causing the effects in the forum state. Quattrone v. Superior Court for County of Los Angeles, 44 Cal.App.3d 296, 306, 118 Cal.Rptr. 548, 554 (1975), synthesizing Hanson v. Denckla, supra, and McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

This jurisdictional basis is ordinarily applied to non-residents who have allegedly engaged in commercial activity subject to explicit statutory regulation by the forum, e. g., McGee v. International Life Ins. Co., supra (intended effects—sale of insurance premiums to California residents by non-resident corporation—subject to specific state statute); Quattrone v. Superior Court for County of Los Angeles, supra (intended effect—issuance of shares by California corporation—subject to extensive regulation under Cal.Corp.Code), or to non-resident corporations whose allegedly negligent manufacture of a product used by a resident has resulted in injury to the resident in the forum, e. g., Duple Motor Bodies, Ltd. v. Hollingsworth, 417 F.2d 231 (9 Cir. 1969). The cases generally involve some attempt by a non-resident to gain economic advantage through the patronage of state residents, and thus involve as well some element of the purposeful connection with the forum which the Supreme Court labelled "essential" in Hanson v. Denckla, supra. See Marra v. Shea, 321 F.Supp. 1140, 1146 & n. 14 (N.D.Cal.1971).[16]

16. In Marra v. Shea, supra, the court suggested that, given the importance of the commercial

relationship, this basis of jurisdiction may be less applicable to individual, non-business de-

In the instant case, plaintiff seeks to extend this jurisdictional basis to apply to six non-resident individuals whose alleged activity involves only the most tenuous connection with the state of California. Certainly none of the defendants had the commercial or professional relationship with the forum which typifies most of the relevant case law. Moreover, the conduct of which she complains, while of paramount concern to all United States citizens, is primarily the subject of federal law. The offending agencies are organized under federal law, the alleged participants were federal employees, and the rights allegedly invaded were primarily federal constitutional rights.

■■■ The only aspect of this case which is peculiarly forum-related is that plaintiff experienced the emotional effect of the alleged activity in California. Neither the federal nor the state courts have recognized that local effects are *per se* sufficient to satisfy the demands of due process. *See Ursini v. The Menninger Foundation,* 384 F.Supp. 158, 162 (E.D.Cal.1974). *See also Sibley v. Superior Court,* 16 Cal.3d 442, 546 P.2d 322, 128 Cal.Rptr. 34, *petition for cert. filed,* 45 U.S.L.W. 3017 (No. 75–1714, May 26, 1976) (forum-based effects insufficient to support the exercise of personal jurisdiction where defendants had neither anticipated economic benefit from activity nor invoked benefits and protection of state law, and where conduct not subject to special state regulation). The Court finds that, given the attenuated connection between the numerous non-resident defendants and the forum, the exercise of personal jurisdiction in this case would be unreasonable, and thus violative of due process.

However intensely our society may militate against governmental surveillance of the nature undertaken in the East Coast Mail Intercept, due process demands a personal and purposeful connection between a non-resident and a forum as a prerequisite to the exercise of long-arm jurisdiction. The Court does not find such a connection here. It will therefore order the dismissal of defendants Cotter, Day, Helms, Karamessines, Mitchell, and Schlesinger from this action.

### Improper Venue

Although all of the defendants have urged that venue in the Northern District is improper, the motion for dismissal on grounds of venue is presently relevant only to defendant McCone, the single defendant remaining in this suit. Because this is not an action in which jurisdiction is founded solely upon diversity of citizenship, the propriety of venue must be established under subsections (b)–(e) of Section 1391 of Title 28 of the United States Code, the statute governing venue in civil actions in the district courts. Plaintiff contends that venue is proper pursuant to subsections (b), (c) and (e).

■■■ The Court summarily rejects plaintiff's contention that Section 1391(c),[17] which relates to appropriate venue in suits against corporations, is applicable to the instant suit. The Court recognizes that the provision does apply to unincorporated associations such as labor unions, *Denver & Rio Grande Western R. Co. v. Bthd. of Railroad Trainmen,* 387 U.S. 556, 87 S.Ct. 1746, 18 L.Ed.2d 954 (1967), and partnerships, *Penrod Drilling Company v. Johnson,* 414 F.2d 1217 (5 Cir. 1969). However, plaintiff has

fendants. 321 F.Supp. at 1146, n. 14. The recent decision of the California Court of Appeals in *Inselberg v. Inselberg,* 56 Cal.App.3d 484, 128 Cal.Rptr. 578 (1976), suggests that court's implicit agreement with the views expressed in *Marra v. Shea.* In *Inselberg,* plaintiff claimed that the out-of-state conduct of the non-resident defendants had had the effect of enticing a child to leave her father, conduct prohibited by state law. Despite the fact that the state had expressed a particular desire to discourage such activity, the court found that

because the defendants' only contact with the forum had consisted of two telephone calls to the daughter in California, the defendants had had an insufficient connection with the forum to support the exercise of personal jurisdiction.

17. 28 U.S.C. § 1391(c) states:

"A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

offered no case support for, and the Court sees no logical basis for, interpreting a provision which on its face applies only to impersonal legal entities to extend to individual defendants. Clearly, plaintiff sues the alleged conspirators individually, not the alleged conspiracy as an entity.

▅▅▅ Nor can the Court agree that Section 1391(e),[18] which relates to venue in civil actions against certain government employees, affords venue in a suit against an individual who has retired from government service as has defendant McCone.[19] The plain language of the statute denotes " * * an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority." All verbs in the provision are in the present tense; the statute refers neither to former government officials nor to private citizens.

The legislative history of the section suggests no intent on the part of Congress to include former officials among those subject to suit under Section 1391(e). The current Section 1391(e) was the second part of a two-part bill which became the Act of October 5, 1962, Pub.L. No. 87–748, 76 Stat. 744. The first section of the Act, now codified as 28 U.S.C. § 1361, granted the district courts original jurisdiction in "action[s] in the nature of mandamus" to compel the performance of a duty owed by a federal official to a plaintiff.

Both the Senate and House Reports explain that the two-part bill was primarily designed to obviate the historical limitation of jurisdiction in mandamus actions to the district courts of the District of Columbia, and the burden to those courts and to plaintiffs which the limitation imposed. The two reports describe the statutory purpose in almost identical language:

"The purpose of this bill, as amended, is to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia, which, because of certain existing limitations on jurisdiction and venue, may now be brought only in the U.S. District Court for the District of Columbia." S.Rep.No.1992, 87th Cong., 2d Sess. (1962), as reprinted in U.S.Code Cong. & Admin.News, pp. 2784, 2785 (1962). See H.R.Rep.No.536, 87th Cong., 1st Sess., at 1 (1962).

Congress's emphasis upon mandamus actions, which would logically be brought only against an individual currently in office and thus capable of taking the desired action, suggests to the Court that Congress did not contemplate that retired officials and employees would fall within the scope of the provision.

Despite the absence of any explicit indication that the statute was designed to apply to former officials, plaintiff argues that the broad construction is necessary to effectuate the statutory purpose of "facilitat[ing] access to the courts, * * * simplify[ing] the process of securing effective relief against federal officials, and * * * improv[ing] judicial efficiency." Plaintiff's Response and Opposition, filed June 21, 1976, at 16. As authority for her position, she cites *Lowenstein v. Rooney*, 401 F.Supp. 952, 962 (E.D.N.Y.1975), in which the court found that

"[t]o assert that because the defendants are no longer in government service the plaintiff may not utilize section 1391(e) —a section clearly intended to permit such actions—would * * * defeat the purposes of the statute."

The Court recognizes that a determination that former government officials fall

---

18. The full text of 28 U.S.C. § 1391(e) appears at 875–877 *supra.*

19. Defendants objected to the use of § 1391(e) to afford venue in this suit on three grounds. In addition to the argument that the provision does not apply to retired government employees, they argued that (1) the provision demands that "each defendant" be an officer or employee of the United States, a condition which is

not met in this suit, and (2) because the legislative history of the Act focuses principally upon actions in the nature of mandamus brought nominally against federal officials, Section 1391(e) is inapplicable to a personal damage suit against an individual official. In light of its conclusions with respect to defendants' first argument, the Court finds it unnecessary to rule on the other two contentions.

outside the scope of § 1391(e) may result in multiple suits and may inconvenience plaintiffs in suits similar to this one. However, it disagrees with plaintiff, and with *Lowenstein v. Rooney*, that such an interpretation contravenes legislative intent. The construction urged by plaintiff would potentially subject a retired government official to suit in any federal court in the country which acquired personal jurisdiction over him or her. The Court finds it inconceivable that Congress would so substantially broaden the venue provision applicable to every individual once employed by the federal government without comment.

Section 1391(e) is indeed a "plaintiff's provision," *Powelton Civic Home Own. Ass'n v. Dept. of H. and U. Dev.*, 284 F.Supp. 809, 833 (E.D.Pa.1968), which, properly invoked, facilitates access to and better distributes the burden on courts in civil litigation against present government officials. The Court is not convinced that the provision was intended to do more. *Accord, Wu v. Keeney*, 384 F.Supp. 1161, 1168 (D.D. C.1974).

Finally, plaintiff contends that venue is proper under § 1391(b).[20] She argues that, because she locally learned of and experienced the emotional distress resulting from the alleged interception of her mail in New York, her claim "arose" in the Northern District. Contending that the venue question is one properly decided by reference to state law, she cites a California case which held that, in an action based upon mental suffering, the injury occurs "at the place or places where worry and loss of sleep finally take their toll." *Lucas v. Lucas Ranching Co.*, 18 Cal.App.2d 453, 456, 64 P.2d 160, 162 (1937).

▉ Although courts have occasionally suggested that a venue determination in a diversity case is a question of state law,[21] *e. g., Philadelphia Hous. Auth. v.*

American Radiator & S. San. Corp.*, 291 F.Supp. 252, 260 (E.D.Pa.1968), it is little debated that a venue determination in a federal question case is properly a matter of federal law, *e. g., Murphree v. Mississippi Pub. Corporation*, 149 F.2d 138, 140 (5 Cir. 1945), aff'd, 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946). The standard most often employed to determine where a cause of action "arose" under § 1391(b) appears to be the "weight of the contacts" test, first articulated in *Philadelphia Hous. Auth. v. American Radiator & S. San. Corp., supra*, a case which involved an alleged price-fixing conspiracy. In that case, attempting to determine where a cause of action alleged to have touched a number of jurisdictions arose, the court said:

"It is submitted that 'where the claim arose' should be dependent upon where the contacts weigh most heavily. A 'weight of the contacts' test would enable venue to exist in a district where the injury occurred, if significant sales causing substantial injury were made to plaintiffs thereby defendants. If some other overt act pursuant to the conspiratorial meetings took place in a district and it was a significant and substantial element of the offense, then venue would lie in that district. Conversely, if one insignificant sale was made in a district, as set forth above in the hypothetical, venue would not lie there. Similarly, if a meaningless and insignificant meeting of the conspirators took place in a certain district, venue would not [lie] there either." 291 F.Supp. at 260–261.

The "weight of the contacts" test has been accepted and followed in a number of subsequent antitrust cases, *e. g., Redmond v. Atlantic Coast Football League*, 359 F.Supp. 666, 669–670 (N.D.Ind.1973); *Fox-Keller, Inc. v. Toyota Motor Sales, U. S. A., Inc.*, 338 F.Supp. 812, 815–816 (E.D.Pa. 1972); *California Clippers, Inc. v. United*

---

**20.** 28 U.S.C. § 1391(b) states:

"A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law."

**21.** This view has been soundly criticized as erroneous. 1 Moore's Federal Practice ¶ 142[5.–2] at 1429.

*States S. F. Ass'n, supra,* 314 F.Supp. at 1062–1065; *ABC Great States, Inc. v. Globe Ticket Co.,* 310 F.Supp. 739, 742–743 (N.D. Ill.1970), in at least one trademark infringement case, *Honda Associates, Inc. v. Nozawa Trading, Inc.,* 374 F.Supp. 886, 890–892 (S.D.N.Y.1974), and in at least one corporate mis-management case, *British-American Insurance Company Ltd. v. Lee,* 403 F.Supp. 31, 36 (D.Del.1975). The test was also employed to determine venue in a civil rights suit, *Jiminez v. Pierce,* 315 F.Supp. 365 (S.D.N.Y.1970).

Plaintiff argues that the "weight of the contacts" test was expressly designed for, and ought to be limited to, antitrust cases. She suggests that, in cases similar to this, the Court ought to find that a claim arises in the district in which the plaintiff experiences injury, citing a personal injury case in which the district court found venue in the district in which the injury occurred. *Kroger Company v. Adkins Transfer Company,* 284 F.Supp. 371, 377 (M.D.Tenn.1968), *affd. on other grounds,* 408 F.2d 813 (6 Cir. 1969).

The Court believes that the issue is unlikely to be resolved by a mechanical differentiation of antitrust from other cases, and has tried instead to extract the logic from the cases interpreting Section 1391(b). Prior to 1966, Section 1391(b) provided that a civil action not founded solely on diversity "may be brought only in the judicial district where all defendants reside, except as otherwise provided by law." Although the legislative history offers little insight into Congress's purpose in laying venue alternatively in the district "in which the claim arose," the Supreme Court has suggested that the amendment was intended to fill the "gap" in venue that existed prior to 1966. That "gap," as described by the Supreme Court, was the occasional unavailability of any single forum in which a plaintiff could sue multiple defendants who resided in different states. Having so characterized the legislative intent, the Supreme Court concluded that " * * * in construing venue statutes it is reasonable to prefer the construction that avoids leaving such a gap." *Brunette Machine Wks. v. Kockum Indus-*

*tries,* 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 1939, 32 L.Ed.2d 428 (1972) (dictum).

Since the enactment of the amendment, the courts have found that an expansive reading of § 1391(b) may pose a problem which Congress did not consider in 1966. While the narrow venue grant of the pre-1966 statute may, in some cases, have deprived plaintiffs of any proper forum, a generous reading of the amended statute might potentially allot some plaintiffs innumerable forums, On the one hand, in products liability cases brought against multiple defendants who reside in different districts, it may often be the case that, if the district in which the injury occurs is not recognized as that in which the claim arose for venue purposes, no forum would exist in which a plaintiff might bring a single suit against all of the defendants. On the other hand, in those suits which allege unlawful conduct of nationwide scope, finding venue in any district in which any portion of the injury is alleged to have occurred would potentially subject an entire group of defendants to suit in dozens of districts.

The evolution of the "weight of the contacts" test demonstrates the agreement of a number of courts that such expansive venue was not within the intent of the Congress in amending the venue provision. Asserting that the "weight of the contacts" test is a responsible judicial interpretation of § 1391(b), the court in *Honda Associates, Inc. v. Nozawa Trading, Inc. supra,* reasoned:

"There is no more in the judicial treatment of the amendment [than the explanation of the Supreme Court in *Brunette Machine Wks. v. Kockum Industries, supra* ] to suggest that it was intended to broaden the choice of venue with respect to 'transitory' causes of action, like the present, which arise from a multitude of similar acts performed substantially throughout the country. * * * If the amendment had really been intended to effect such a drastic expansion of venue in transitory actions, it seems unlikely that Congress would have enacted it without appropriate comment and that

the courts would have been equally silent about it in the seven years that have followed." 374 F.Supp. at 891.

Thus, it appears that the "weight of the contacts" test is appropriately applied in those cases which, rather than threatening a plaintiff with no proper forum, threaten defendants with potentially unlimited venue.

The Court believes that the instant controversy is one in which venue ought to be determined according to a "weight of the contacts" test. Plaintiff complains of an alleged conspiracy which reached nationwide and may have touched hundreds of individuals. If the Court accepts her theory that the claim arises in any district in which a victim of the mail intercept project learned of his or her injury, it implicitly adopts the view that venue is proper in any district in the country. At the same time, if the Court decides that the claim "arose" not in the Northern District, but in a district in which some more substantial activity of the conspiracy is alleged to have occurred, it suggests at least that it believes venue would lie in the Southern District of New York where the East Coast Mail Intercept operated during its twenty-year life.

Because determining venue in this case according to the "weight of the contacts" test does not appear to contravene legislative intent, and is responsive to the concerns of numerous courts who have interpreted Section 1391(e), and because the Northern District was not the situs of any of the more significant activity of the East Coast Mail Intercept, the Court finds that venue in the Northern District is improper.

### Summary and Order

Having determined that (1) plaintiff no longer states a cause of action against defendant Bush, (2) suit against the United States is barred by the doctrine of sovereign immunity, (3) the Court lacks personal jurisdiction over defendants Cotter, Day, Helms, Karamessines, Mitchell and Schlesinger, and (4) venue is improper against defendant McCone, the Court finds that it must dismiss each of the named defendants

from his action. Because the dismissal of the named defendants results in a suit against "an unknown number of unnamed present and former employees of the United States," and because the federal courts disapprove "Doe" pleadings, the dismissal of all of the named defendants warrants the dismissal of this action. Finally, inasmuch as it does not appear that plaintiff would be barred from instituting her action in an appropriate forum of her choice at this time, or that the interests of justice warrant the transfer of the action, the Court declines to transfer the action to another forum.

Accordingly, IT IS HEREBY ORDERED that defendants' motions for summary judgment are denied.

IT IS HEREBY FURTHER ORDERED that for the reasons discussed above, defendants' motions for dismissal are granted.

IT IS HEREBY FURTHER ORDERED that the Third Amended Complaint, and the claims therein, are dismissed, with the parties to bear their respective costs.

IT IS HEREBY FURTHER ORDERED that counsel for each of the defendants shall promptly prepare an appropriate form of judgment, obtain approval of counsel for plaintiff as to form, and submit it to the Court for execution.